[No. 16354. *En Banc.* April 14, 1921.]

THE STATE OF WASHINGTON, *Respondent,* v. BRITT SMITH *et al., Appellants.*[1]

CRIMINAL LAW (34)—CHANGE OF VENUE—DISCRETION OF COURT. Under Rem. Code, § 2019, vesting the court with discretion with respect to granting a change of venue on the ground of alleged excitement or prejudice against defendant, the denial of a change by the court, after first expressing an opinion that a fair trial could not be had in the county and orally fixing a future date for determining to which county to send the case, at which time the whole question was reconsidered, would not constitute prejudicial error.

HOMICIDE (44)—EVIDENCE—ADMISSIBILITY—CIRCUMSTANCES PRECEDING ACT. In a prosecution of certain members of the I. W. W. organization for the murder of the commander of the local company of the American Legion, evidence that another organization had made threats against the I. W. W., and a year and a half prior to the murder had assaulted their hall, was properly excluded where there was no evidence that deceased knew of the threats or made any overt act in carrying out any design of an assault upon the hall.

[1]Reported in 197 Pac. 770.

CRIMINAL LAW (161)—EVIDENCE—CONFESSION OF ACCOMPLICE—RE-BUTTAL—ADMISSIBILITY. Where an accomplice testifies on the trial against his associates and is subject to cross-examination, proffered evidence that written statements made by him prior to the trial, substantially the same as his testimony, were procured under duress is inadmissible.

SAME (118)—EVIDENCE—COMPETENCY—REMOTENESS. In a prosecution for murder by members of the I. W. W. organization, cross-examination of a witness for the state as to whether he had taken part in the deportation of a member of the organization about a year and one-half previously was properly excluded as immaterial.

SAME (118). In a prosecution of certain members of the I. W. W. organization for murder, the rejection of cross-examination of a witness for the state as to whether he was prejudiced against the organization was not prejudicial, the inquiry being remote, the organization itself not being on trial.

HOMICIDE (113)—TRIAL—INSTRUCTIONS—DEFENSE OF PROPERTY. Under Rem. Code, § 2406, defining justifiable homicide, an instruction that a homicide committed by armed men placed at outside stations to defend persons, habitation, or property located in another place, constituted murder was proper, since the question whether persons stationed at places some distance from a hall were in the presence or company of those in the hall was one of law and not of fact.

SAME (132)—APPEAL—INSTRUCTIONS AS TO LESSER OFFENSE. Where an instruction on murder in the second degree was given as requested by defendants, they cannot assign it as error on the ground that the defendants were either guilty in the first degree or not at all.

SAME (119)—TRIAL—INSTRUCTIONS—ABSENCE OF EVIDENCE JUSTIFYING MANSLAUGHTER. Under the presumption of law that homicide proven beyond a reasonable doubt is murder in the second degree, the burden rests upon the defendant to reduce it to manslaughter or to justify it.

CRIMINAL LAW (437)—NEW TRIAL—MISCONDUCT OF JUROR. An application for a new trial on the ground of alleged prejudice of a juror was properly denied upon conflicting affidavits, it further appearing that the juror joined in the lowest possible verdict against the defendants and joined in a written request to the court for leniency to all who were convicted; the weight of the evidence on affidavits for new trial on the ground of prejudice of a juror being more readily determinable by the trial court than by the appellate court acting on the affidavits alone.

Appeal from a judgment of the superior court for Grays Harbor county, Wilson, J., entered April 5, 1920, upon a trial and conviction of murder. Affirmed.

*George F. Vanderveer,* for appellants.

*C. D. Cunningham, J. H. Jahnke,* and *Herman Allen,* for respondent.

MITCHELL, J.—On November 11, 1919, Warren O. Grimm, Ben Casagranda and Arthur McElfresh, members of the American Legion, were killed in Centralia, Lewis county, Washington, while participating in a patriotic parade, the first anniversary celebration of the signing of the Armistice.

Britt Smith, O. C. Bland, Bert Faulkner, Ray Becker, John Doe Davis, James McInerney, Loren Roberts, Eugene Barnett, Mike Sheehan, Bert Bland, Ole Hanson, John Lamb and Elmer Smith were charged by an information with the crime of murder in the first degree for the killing of Warren O. Grimm. Davis and Hanson escaped and were never captured. The other defendants plead not guilty, and in addition Loren Roberts entered a special plea of not guilty by reason of insanity. At the trial, upon the conclusion of the state's case in chief, upon motion of the defendant and by order of the court, Bert Faulkner was discharged. The jury acquitted Elmer Smith and Mike Sheehan; found Loren Roberts not guilty by reason of insanity; and convicted the rest of the defendants on trial of the crime of murder in the second degree. Those convicted, viz, Britt Smith, O. C. Bland, Ray Becker, James McInerney, Eugene Barnett, Bert Bland and John Lamb, have appealed.

The tragedy occurred on Tower avenue which runs north and south. The avenue is intersected at right angles by Second street and by Third street north of

Second street. The avenue is eighty feet wide and Second and Third streets sixty feet each. The southeast corner of the avenue and Second street is occupied by a stable fronting fifty feet on the avenue. Adjoining it on the south is the Avalon Hotel, a two story rooming house fronting twenty-five or thirty feet on the avenue. Across the avenue, in front of the last mentioned buildings, are two business houses. The northeast corner of the avenue and Second street is occupied by a building, north of which there is a lot of about one hundred feet frontage on the north part of which is situated a small residence set back from the avenue. About one hundred and twenty-five feet north of Second street is the south wall of the Arnold Hotel, a two story rooming house fronting about thirty feet on the east side of Tower avenue. The northwest corner of the avenue and Second street is occupied by a two story brick business block fronting fifty feet on the avenue; adjoining it on the north is the Roderick Hotel fronting about thirty feet on the avenue; adjoining it on the north is the I. W. W. Hall fronting about twenty-five feet on the avenue; and adjoining it on the north is a one cent to one dollar store. On each side of Tower avenue north of the buildings referred to, and as far as Third street, the property consists of buildings separated by lots or parts of lots. The sidewalk on the west side of the avenue and in front of the hall is sixteen feet wide. Another place of importance in this case is what is called Seminary Hill. It is unsettled and is situated four hundred yards east from the I. W. W. Hall and has an elevation of about seventy-five feet above Tower avenue. The avenue at the hall, and for a short distance each side of the front of the hall, is. in plain view from Seminary Hill.

On September 2, 1919, Britt Smith rented the building for the I. W. W. Hall for four months. The lower floor in the front was fitted up and used by the I. W. W. for assembly purposes. Britt Smith resided in the rear part of the building on the ground floor, and acted as secretary for the I. W. W. The place was local headquarters for members of the organization. In it they held public meetings and engaged in propaganda work, held conferences and kept their literature which was sold and distributed.

It was the contention of the prosecution at the trial that defendants acted pursuant to a prearranged plan to shoot and slay members of the Centralia or Grant Hodge post of the American Legion on passing the I. W. W. Hall in the parade and that the killing of Warren O. Grimm was wholly unprovoked. On the other hand it was the theory of the defendants on trial that the business men or Commercial Club of the city had recently planned and threatened to raid the I. W. W. Hall on the occasion of this celebration and that they used the members of the post as a means to accomplish that purpose; and that the members of the post were the aggressors while the defendants only defended themselves and their property.

The defendants were I. W. Ws. Nearly all of them in testifying admitted they were provided with dangerous weapons, and many of them admitted the stations they occupied at the time of the shooting. There was testimony showing numerous conferences and preparations on the part of the defendants (different ones of them from time to time) for several days including the 11th of November and up until the time of the shooting. About one o'clock that day Bert Bland, Loren Roberts and Ole Hanson by somewhat different ways went to Seminary Hill. They were pro-

vided with heavy clothing and carried a suit case containing arms, ammunition and food. The former was armed with a 25 caliber Colt's automatic pistol and a 32-20 caliber Winchester rifle, the latter of which he shot some eight times. Loren Roberts was armed with a 22 high-power Savage rifle which he shot a number of times. (Counsel for appellants in his brief says: "One of these bullets probably killed Arthur Mc-Elfresh.") Hanson was armed with a 250-3000 Savage rifle, which he shot a number of times. A total of twenty or twenty-five shots were fired by these three men. There is evidence to show that Davis (not captured) and appellant Barnett took stations at the south front window on the second floor of the Avalon Hotel, seventy-five feet south of Second street—a room rented and occupied for several nights before by Bert Bland. There is testimony that Barnett owned and was armed with a 38-55 Winchester rifle (the only one of that size among the defendants) and that a number of shots were fired from that window. Warren O. Grimm was killed by a 38-55 Winchester bullet. John Lamb and O. C. Bland were in a front room, upstairs in the Arnold Hotel, armed with a rifle and revolver, whence shooting was done, as testified to by the state's witnesses. The rest of the defendants who were tried, other than Elmer Smith, were stationed in the I. W. W. Hall, nearly all of whom it was shown were armed.

The parade took the same route as that traveled on similar occasions for several years. It formed at the city park shortly before two o'clock. It was composed of a number of more or less independent divisions, the first comprising members of the Elks Lodge; the second a band; third a contingent of boy scouts, marines and sailors; fourth, the Chehalis post of the American Legion; fifth, the Centralia post of the

American Legion; and, sixth, a few automobiles carrying Red Cross nurses in uniform. The Centralia division of the American Legion was under the direction of its post commander, Warren O. Grimm. In this order the parade moved east on Main street to Pearl street, thence to Tower avenue, thence north .on the east side of the avenue to Third street where it turned and retraced its way on the west side of the avenue. It was the program to return to the High School auditorium south of the city park where patriotic exercises were to be held. The soldiers, or ex-soldiers, in uniforms, were marching in platoons that were supposed to be separated from each other regularly by three or four paces. The Centralia post consisted of seventy or eighty men, or eight platoons. It was testified to that in making the turn at Third street the distance between the platoons became more or less unsettled.

On reaching a point at about the intersection of Second street and the avenue Warren O. Grimm, at the head of his division gave the command "Halt, close up." It is the proof of the state that, while the movement required by the order was being executed, a shot was fired into the parade column of the Centralia soldiers from either the Avalon Hotel or the I. W. W. Hall, and that two or three other shots were instantly fired into them from nearby and that these were in a few moments of time followed for several minutes by a volley or fusillade from Seminary Hill, the Avalon and Arnold Hotels and the I. W. W. Hall, consisting of fifty to one hundred and fifty shots altogether, as fixed by various estimates; that, upon realizing the situation, the Centralia soldiers broke for shelter running to the northwest and southwest for protection behind the buildings, except a few who, upon noticing the shooting from the hall, attempted to enter it but

were driven back by pistol or gun fire from within, at which time a soldier named Pfitzer was disabled by a shot in the left arm; that Warren O. Grimm was shot at the point at which he was standing when he gave the order, and ran and staggered southwesterly to the rear of the building on the southwest corner of the two streets where he fell mortally wounded; that Ben Casagranda was mortally wounded near Second street as he turned the northwest corner of the two streets; that another soldier was badly wounded near the same place, and that Arthur McElfresh was shot and instantly killed, falling against the north wall of the store situated north of the I. W. W. Hall; that others were more or less wounded by the gun fire; that the attack was wholly unexpected by the soldiers none of whom was armed, other than small arms carried by the guards of the color bearers (according to military rule) which at that time were marching far down the avenue south of Second street.

On the contrary there is testimony by the appellants that, upon receiving the order of Commander Warren O. Grimm to "Halt, close up" instantly a number of the Centralia division of the American Legion dashed toward the I. W. W. Hall and commenced to force an entrance through the doorway, whereupon and not until then the shooting by the defendants occurred.

I.   On the application of defendants, a change of venue from Lewis county was granted, on the ground of excitement and prejudice against the defendants. The case was transferred to Grays Harbor county. The defendants applied for a change of venue from Grays Harbor county. The application was resisted by the state. Upon hearing it the trial court orally announced the opinion that a fair trial of the defendants could not be had in that county, and fixed a fu-

ture date on which to determine which one of two other counties named would be designated for the trial. At the time appointed, on account of certain motions and applications of both sides, the trial court reconsidered the whole question, over the protest of the defendants, with the result that the application for a change of venue from Grays Harbor county was denied. Again, when the case was called for trial, the defendants renewed their application for a change of venue. It was denied. The refusal to grant a change of venue from Grays Harbor county is presented as an assignment of error. It is assumed, for the purposes of this case only, that a trial court has the right to entertain a motion for a change of venue from a county to which a case has been sent, for the reason in each case of excitement and prejudice against the defendants. It is argued that, when at first the court orally expressed the opinion that the defendants could not have a fair trial in Grays Harbor county and was undecided as to what county the case should be sent to, thereafter the only action the court could take was to decide on such other county. The statute (Rem. Code, § 2019) provides,

"If the affidavit is founded upon excitement or prejudice in the county against the defendant, the court may, in its discretion, grant a change of venue to the most convenient county."

The oral announcement by the court did not meet the full requirements of the statute—no county was fixed upon for the trial. The matter was but in the process of final adjudication. Not having been transferred, the venue was still in Grays Harbor county and without question subject to reconsideration by the judge of that county. On the merits of the application it was by no means a one-sided controversy. The affi-

davits each way were exceedingly numerous and voluminous. On the one side there was the discovery of excitement and passion. On the other side there was the picture of persons and communities ignorant of or unconcerned with conversations or reports of the tragedy and tempered with the idea of fairness and impartiality. The record discloses a painstaking consideration by the trial court on the several occasions the matter was before him. Under such circumstances, this court has uniformly held against a review favorable to the losing party, upon appeal.

"It is apparent, from a reading of these sections, that the granting or denying of the change of venue is a matter resting entirely in the sound judicial discretion of the trial judge. Such being the statute, the ruling of the trial court cannot be reversed upon appeal, unless the record contains some evidence of its gross abuse, or it is shown that the court's ruling was arbitrary. Such has been our holding whenever such a question has been before us. *McAllister v. Washington Territory,* 1 Wash. Terr. 360; *Edwards v. State,* 2 Wash. 291, 26 Pac. 258; *State v. Straub,* 16 Wash. 111, 47 Pac. 227; *State v. Champoux,* 33 Wash. 339, 74 Pac. 557." *State v. Welty,* 65 Wash. 244, 118 Pac. 9.

See, also, *State v. Wright,* 97 Wash. 304, 166 Pac. 645; Bishop's New Criminal Procedure (2d ed.), § 72, pp. 51, 52.

Other considerations strongly supporting the conclusion that there was no abuse of discretion in this respect is that there is nothing in the record here to show (there being no report of the *voir dire* examination of the jurors) but that this case was tried by a jury each of whom (other than the juror Sellers, to be referred to later) had never even heard of the case until called into the jury box; and the further fact that the defendants waived their right to exercise the full number of challenges allowed by the statute, thus

impliedly indicating the content suggested by the idea of a fair jury.

II.   It is claimed the court erred in excluding evidence tending to show a conspiracy to assault the hall.   But defendants and their witnesses did testify that they understood the hall was to be raided.   Appellant O. C. Bland testified that he,

"Believed the soldiers would come into a raid of the hall all armed some way and beat up all of us and at least tar and feather us.   I had reasons for so believing.   There had been talk about a raid on the hall and the boys said they would protect the hall."

Appellant Lamb testified that he had heard days before that there was to be a raid on the hall.   Appellant Bert Bland testified:

"I heard talk for eleven days prior to the raid of the I. W. W. Hall that the hall was going to be raided.   I heard it in the hall, I heard it in the streets and I heard it in the logging camps, it was a general discussion."

Appellant McInerney testified:

"The fellow workers were coming and going all the time in the hall and they talked about the raid.   It was thought they were going to raid the hall.   We thought they would come down and tear us up and hang some of us, that's what I thought, and wreck the hall."

Other similar testimony by the appellants was given. But further, however, the appellants offered proof of a meeting of the Commercial Club on October 20, at which, it was claimed, considerable hostility was expressed against the I. W. W., and some possible plan suggested to get rid of them; and that in the spring of 1918 a raid was made upon their hall, at another place in the city, by members of the Commercial Club, at which time one I. W. W. was rudely handled and another forcibly carried away.   There was no proof, nor offer of proof, to show that Warren O. Grimm, or

either of the other persons killed on November 11, or any other member of the Centralia post was a member of the Commercial Club or present at the meeting on October 20, with the possible exception of one member of the post. There was no proof, nor offer of proof, that the hostility expressed at that meeting was ever made known to Warren O. Grimm or other members of the post, or that he or they were ever spoken to for the purpose of doing any violence to members of the I. W. W. or its hall. While as to the assault on the hall and violence to members of the I. W. W. in 1918, there was no proof or offer of proof to show that Warren O. Grimm or any of the members of the post, as afterwards established, were present in Centralia at that time—they were probably in the United States service at that time. As to circumstances prompting appellant McInerney to carry a gun on the day in question, proof was offered that he and others had been victims of an assault at Everett, Washington, organized by the Commercial Club of that city, on November 5, 1916; and further, certain matters within his knowledge concerning the deportation of twelve hundred men by the commercial interests of Bisbee, Arizona. It is claimed that the hostility of the Commercial Club, or the threats referred to, were admissible, "to show the feelings of the deceased, to show who was the aggressor, and for the purpose of enabling the jury to determine whether the deceased acted in a manner to create apprehension," and that, "there was ample evidence of an act of either actual or apparent aggression on the part of Mr. Grimm."

Concerning the disposition of the deceased at that time, there was no evidence, as already stated, indicating that he knew of any threats against the I. W. W. or their hall; while as to an actual or apparent overt

act on the part of the deceased, special care has been taken in examining the record, because of a dispute between the parties, from which it appears that of the one hundred and fourteen witnesses examined on behalf of the defendants only eleven testified in a way to furnish any appearance of support for the contention. Indeed, in this respect, counsel for appellant in his reply brief relies upon the testimony of only eleven witnesses. The testimony of those eleven witnesses shows that, with one or two exceptions, they were wholly unacquainted with Mr. Grimm, and not one of them claims to have seen him at or about the time of the shooting until after he was shot and, in a disabled staggering condition, was going southwest to where he finally fell, other than the witness Ferguson who saw him a moment before the shooting at the head of his column near Second street.

The eleven witnesses testified in substance as follows:

Guy Bray: "Q. What did they do when the shots were fired? A. Bunched together and started to go for the hall. . . . Q. Did you see either Grimm or Van Gilder do anything? A. No sir. . . . Q. Did you see anything to indicate that either of them was hurt? A. Only one, I seen. I wasn't sure it was Grimm or not. There was a shot and he grabbed his stomach and started to bend over. Q. Where did he go? A. He went towards the curbing and fell down over on the edge of the curbing. That is the last time I seen him." Ray Cook: At the time of the shooting first saw deceased six or eight feet out in the avenue about twenty-five feet from Second street, wounded, coming towards the corner of the avenue and Second street. Didn't know Grimm and might have been mistaken. Jay Cook's testimony was to the same effect.

He and his brother Ray Cook were standing together at northwest corner of the avenue and Second street. Sam Ferguson: Was standing at northwest corner avenue and Second street. Knew Grimm but not well. Noticed him when the shooting commenced. "Just a couple of feet from you? A. Close to me." Thought he saw him grab his leg. Deceased and witness both went across Second street and he saw him south of Second street back of the building, appeared to be wounded. Anna Martina: At time of shooting was at home situated south of Second street in the west half of the block west of the avenue. After the shooting saw soldiers coming from the avenue, around the corner and saw a wounded soldier south side of Second street behind building. Didn't know who he was. Helen Martina: Was with her sister Anna and testified to the same effect. J. L. Morgan: Was standing on southeast corner of avenue and Second street. Did not know deceased. At time of shooting saw the wounded man going south on avenue at a point about midway between the curb and center of the street somewhere near opposite the north front of the corner brick building. Walter Morrow: A soldier in the third platoon. The division, Warren O. Grimm in front of the column, halted, then started marching and after going a few steps heard a noise like a crash and bunch of fire crackers shooting. Left the street during the shooting, took position in front of the Roderick Hotel and saw Grimm wounded down somewhere between him and the corner of the avenue and Second street. Vernon O'Reilley: Stood on west sidewalk two hundred feet south of the hall. Centralia division halted, head of column slightly north of Second street. Soldiers at head obscured by automobile. Number of people on sidewalk between him and hall. At time of

shooting saw a wounded soldier on the sidewalk at a place estimated to be in front of door to Roderick Hotel. Did not know Grimm. Could not identify him, saw what he thought to be the same man helped into an automobile on Second street. John Patterson: Saw the rear end of the Centralia division, was near the front of the hall at the time of the shooting. Saw wounded soldiers but didn't know who they were but was told one of them was McElfresh. Mrs. May Sherman: A stranger in Centralia. Was on sidewalk in front of Roderick Hotel during all the shooting. Only one man wounded along there, on the sidewalk or in front of the I. W. W. hall and if there had been others wounded "sure would" have seen them. Didn't know if he was holding one arm with the other hand, didn't pay particular notice, just saw that his arms were crossed that way (indicating). Couldn't describe the man any way except he was large and had on an army overcoat. Didn't look at him close enough to give any other description.

(Warren O. Grimm and Ben Casagranda were taken in an automobile at the same time from Second street to the hospital and the former did not wear an overcoat at the time of the parade, as testified to by those who were acquainted with Grimm.) The testimony offered was properly rejected. The appellants and their witnesses testifying that the hall was attacked prior to the shooting, and that they understood and believed a raid of the hall had been threatened, the testimony, offered was immaterial. The contention made in the brief that "threats, even if uncommunicated may be proved to show the feelings of the deceased, to show he was the aggressor and for the purpose of enabling the jury to determine whether the deceased acted in a manner to create apprehension"

cannot prevail, for there was neither proof nor offer of proof to show the deceased had ever made any threats or that he was aware any one else had; nor that the Centralia post had made any threats.

III. One T. C. Morgan, who was in the hall at the time of the shooting, was apprehended that evening and confined in the city jail. At the trial he testified on behalf of the state concerning conferences and plans of the defendants for some days and up until the shooting occurred. In his cross-examination it was developed that, while he was under arrest, he made for the state two statements that were reduced to writing of the conferences and acts of the defendants, both of which he said were made freely and that they were substantially the same as his testimony before the jury. Neither of the written statements was offered in evidence. Later in the trial, while the defense was putting in its evidence, the defendants offered to prove by their personal testimony the circumstances under which the written statements of Morgan had been made, to show, as they claimed, that on each occasion he was acting under fear produced by threats. The proof offered was rejected by the court. Appellants claim that, because of the force and purpose of the offered testimony to impeach and discredit the witness Morgan, the ruling of the court was erroneous. The cases of *State v. Montgomery*, 56 Wash. 443, 105 Pac. 1035, 134 Am. St. 1119, and *State v. Miller*, 78 Wash. 268, 138 Pac. 896, are relied on. In the *Montgomery* case a witness for the state in the course of her examination in chief was denounced by the prosecuting attorney. This court said,

"The prosecuting attorney thereupon stated to the court, in the presence of the jury, that the witness had stated the contrary to him many, many times; that the witness had been tampered with, and bought, etc."

In the *Miller* case, a confederate, Willis Taylor, had made a confession, implicating Miller, that was not used at the trial, but Taylor was produced as a witness by the state. The defendant (aware of the confession) objected to his testimony and demanded a preliminary examination for the purpose of showing duress. The demand was denied and this court held properly so, for the very clear reason that the witness was in court and subject to cross-examination. Manifestly neither of the cases relied on is helpful to these appellants, but on the contrary the result and reason of the *Miller* case is against them. It was said:

"Taylor was offered as any other witness for the state, and as was said in the last *Miller* case, 'There is a clear distinction between evidence of a confession and evidence in chief.' Appellant was entitled to the same method of attacking the testimony of Taylor as that allowed in the case of any other witness, but we know of no rule that would give him any additional privilege in this regard."

IV. It is presented as error that the court sustained objections to questions in the cross-examination of the state's witnesses, Patton and James. Patton was successively asked if he did not take part in kidnaping Lassiter, an I. W. W., in Centralia on June 13, 1918; if he did not assist a number of self-constituted officers in deporting him, putting him in a machine; and if he did not say to another person at that time "There goes one of them" or "We have got one of them; now there are two or three more we will get later on." To each question an objection was sustained. Clearly this was an attempt to indirectly get before the jury the circumstances of an alleged raid on the I. W. W. Hall the year previous which the court had already shut out several times, as improper and immaterial. Because of an objection, the witness

James was not permitted at the conclusion of his cross-examination to answer if he was prejudiced against the I. W. W. Nothing had been said by or to the witness about the I. W. W. until that question was put; he gave no testimony showing any acquaintance with either defendant; nothing to show that he understood or had ever heard that either of them was an I. W. W.; the defendants were not on trial for being members of the I. W. W.; nor was he asked if he had any bias or prejudice against the defendants or either of them —they were the parties to the action and not the I. W. W. Indeed, upon the request of defendants the court instructed the jury that,

"The I. W. W. is not on trial and that the economic and social theories of that organization whether subscribed to or not by the defendants must not be allowed to prejudice you as against the defendants."

The inquiry was remote, and while the court in its discretion probably might have allowed an answer to the question, we are satisfied no prejudice resulted from its rejection.

V. By instruction number 50 the jury was told, in effect, that any person or persons has or have the right to defend himself or themselves or his or their property from actual or threatened violence, to the extent of arming himself or themselves. That the collection of arms to be used in self-defense is of itself proper and lawful but the law does not authorize the collection of arms and the placing of armed men at outside stations in the defense of persons, habitation or property inside, and that, if any two or more of the defendants planned to defend the hall or persons or property therein by stationing armed men in the Avalon Hotel, the Arnold Hotel and on Seminary Hill for the purpose of shooting persons actually or apparent-

ly engaged in raiding the hall or persons or property therein, the shooting of such men and the shooting from said outside points would not be lawful acts of defense of persons or property but would be unlawful; and that, if such plan was carried out and as a result Warren O. Grimm was shot and killed, then the killing would be murder; but that the mere collection and presence of arms is not sufficient whereon to base an inference of guilt nor proof of conspiracy.

Appellants contend that by this instruction the court invaded the province of the jury, and converted an issue of fact, or mixed fact and law, into an unmixed question of law—that the question should have been submitted to the jury for decision on the basis of reasonable necessity. The cases of *State v. Barr,* 11 Wash. 481, 39 Pac. 1080, and *State v. Marfaudille,* 48 Wash. 117, 92 Pac. 939, 15 Ann. Cas. 584, 14 L. R. A. (N. S.) 346, are confidently relied on. Together they are authority for the rule it is contended should be applied here. They are spring gun cases. In the first one, the instrument was placed inside the cabin the defendant resided in, and in the other one, inside the defendant's trunk. In the one case it was contended by the defendant he was within his rights as a matter of law, and in the other it was contended that as a matter of law the defendant was not within his rights. This court held those were questions for the jury. However, clearly, those cases are out of order here. In each the weapon was within the habitation or property intended to be protected. The instruction here complained of must be considered in connection with the particular facts and surroundings in this case. The question under the instruction is not the reasonableness of conduct in defending person or property in the presence of the defender, but whether or not persons stationed at the

three places mentioned were so situated that they had the right to act at all in the claimed defense of the persons and property involved. That was a question of law. Homicide is excusable, or justifiable, or it is unlawful. The first is not involved in the instruction, but the others are. Section 2405, Rem. Code, deals with justifiable homicide by public officers. Section 2406, Rem. Code, provides.

"Homicide is also justifiable when committed either,

"(1) In the lawful defense of the slayer, or his or her husband, wife, parent, child, brother or sister, or of any other person in his presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer, or to any such person, and there is imminent danger of such design being accomplished; or

"(2) In the actual resistance of an attempt to commit a felony upon the slayer, in his presence, or upon or in a dwelling, or other place of abode, in which he is."

It follows that the instruction given is the law unless it must be held that persons situated in the three places referred to were in the presence or company of those in the hall. Whether any one was in either of the three places was a question of fact, but whether persons at those places were in the presence or company of those at the hall, and hence qualified to act under the statutory rule with reference to justifiable homicide, was a question of law, which, if correctly decided by the court, justified the instruction. And we are satisfied it was correctly decided. Under the evidence, if there were persons in the Avalon Hotel, they were hid away in a room to themselves and in the presence or company of no one else; the same as to persons in the Arnold Hotel; and the same as to persons in the cup-like hollow on the top of Seminary Hill. Persons

at those places would be separated from the presence and company of persons at the I. W. W. Hall and their property, by streets and distances of such magnitude as to make it impractical to use other than high powered rifles to do effective shooting, just as was done. As a matter of law, they would be no more in the presence and company of the persons and property pretended to be defended than if they had been miles away using cannon to cover the intervening space; and, as already stated, that is a question of law, for it amounts only to an applied construction of terms used in the statute defining justifiable homicide.

VI. The court refused to give instructions 26 to 41, inclusive, 44, 50 and 64 requested by the appellants. They are lengthy and need not be set out here nor discussed other than to say an examination shows that three of them were given after being properly modified, and the remainder, while probably correct as abstract statements of law, were not applicable to the facts in the case as it finally went to the jury. The feature of those refused that is still insisted upon relates to self-defense. It has been noticed that there was no testimony to show any overt act on the part of the deceased of whom, as stated by counsel for appellants in the brief, "it is undisputed that he was killed by a 38-55 rifle ball fired either by John Doe Davis or the defendant Eugene Barnett from the Avalon Hotel window"; and having seen that, as a matter of law, a person purposely stationed at the Avalon Hotel was not within the presence or company of property or persons at the hall, within the purview of the statute on justifiable homicide, and it appearing that the appellants other than Barnett were acting in concert with Davis and Barnett, the instructions were properly refused.

VII. Claiming the appellants were guilty of mur-

der in the first degree or not guilty at all, and that the verdict settles nothing, appellants assert ''the court erred in receiving the verdict of murder in the second degree, and entering judgment on said verdict.''

The record discloses that the appellants in writing requested the court to instruct the jury on murder in the second degree, and that the court did so in the language requested. Again, if a homicide is proven beyond a reasonable doubt, the presumption of law is that it is murder in the second degree, and if defendant would reduce it to manslaughter or justify it the burden is upon him to do so. *State v. Clark,* 58 Wash. 128, 107 Pac. 1047; *State v. Ware,* 58 Wash. 526, 109 Pac. 359; *State v. Drummond,* 70 Wash. 260, 126 Pac. 541. In this case the crime of manslaughter is not involved and it cannot be held as a matter of law that the appellants' proof justified the homicide.

VIII. Finally, it is contended the motion for a new trial should have been granted for the further reason that the juror Harry Sellers was prejudiced. Affidavits of five persons were filed in support of the motion, showing statements in the presence of certain of the affiants at different times indicating prejudice on the part of the juror. Counter affidavits of Sellers were filed denying making the statements, and a number of affidavits by other persons showing that one of the affiants supporting the motion was feeble-minded and hard of hearing, and that certain of the others were sympathizers of the defendants, one of whom had been active for them in and about their preparation for trial. In material respects the situation is substantially similar to those in the cases of *State v. Underwood,* 35 Wash. 558, 77 Pac. 863, and *State v. Moretti,* 66 Wash. 537, 120 Pac. 102, and we think presents no better reasons for a reversal than appeared in those cases. In

the Oklahoma case of *Smith v. State,* 5 Okl. Cr. 282, 114 Pac. 350, referred to in the *Moretti* case, the court adopts a pertinent saying of an attorney in that case as follows:

"We think that the best evidence of the fact that the juror never made such statement is that after his desire, if he had any, was gratified and he sat upon the jury, he returned a verdict assessing the lowest punishment for manslaughter in the first degree."

So in this case, the verdict was the lowest possible against the defendants, and the juror Sellers, with others, at the time of returning the verdict, made a written request to the court for leniency to all who were convicted. While it may not be said the comparative favor in the verdict and the request for leniency were of controlling force, they were, nevertheless, facts and circumstances before the court when he passed upon the question of fact presented by the affidavits on the motion for a new trial.

It is argued, "all the affidavits are before this court; and this court can decide as well as the trial court where the weight of the evidence lies." We do not so agree. One of the affidavits is supported by a stenographic report of the *voir dire* examination of the juror Sellers wherein it appears, as counsel for appellants say: "He was questioned at great length by defendants' counsel." The trial court had the advantage of a close study of the juror during that long and tedious examination on his *voir dire.* He had the advantage of observing the courtroom bearing of the juror during the course of a trial lasting from January 26 to March 13. Those were signal advantages of the trial court that we do not have in disposing of the question of fact. The judgment and discretion of the trial court were called into exercise, and upon a con-

sideration of the record and the rule in such cases the denial of the motion for a new trial must be sustained. Affirmed.

ALL CONCUR.