DANIEL HUGHES

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield March 27, 1886.*

1. CRIMINAL LAW—*record as showing return of indictment.* A recital in the record of a criminal case as follows: "And now, on this 6th day of March, A. D. 1884, and the fourth judicial day of the March term of the circuit court of Crawford county, Illinois, duly selected and sworn, and returned into open court the following true bills of indictment, all of which are indorsed by the foreman thereof as and for true bills,"—is held to show from the context that the grand jury came into court and presented the indictments, and is sufficient.

2. SAME—*self-defence.* The law will not permit one to follow up his enemy, and if an encounter ensue, kill him, and justify the killing as being done in self-defence.

3. PRACTICE—*sustaining objection to question when a like question had been answered.* On the trial of one for murder, the defendant called a witness, who was permitted to and did state that he had heard the deceased

make threats against the defendant. He was then asked to "state what they were," an objection to which was overruled. The witness failing to answer, he was then asked, "Have you heard the deceased, J., make any threats against the defendant now on trial?" This question was objected to, and the objection sustained: *Held*, no error, as the witness had already answered the question.

4. EXCEPTION—*when necessary*. If no exception is taken on the trial to a witness stating his opinion, an assignment of error as to the admission of the evidence can not be considered.

5. NEW TRIAL—*opinion of juror before the trial*. A verdict will not be set aside on the ground that a juror taken on the trial had, before being called, formed and expressed his opinion of the guilt of the accused, unless it is made to appear, from satisfactory evidence, the juror had previously "formed and expressed" an opinion hurtful to the defence.

6. SAME—*sickness of juror*. The fact that a juror in a capital case was taken suddenly ill, which was not noticed until the trial was over and the jury had retired, after which he became unconscious for a few hours, during which no discussion of the case was had, is not a sufficient ground for a new trial on behalf of the defendant.

7. TRANSCRIPT OF RECORD—*in Supreme Court—impeachment thereof*. The attestation of the clerk of the circuit court to the transcript of the record sent up by him, imports absolute verity, and the transcript and his attestation can not be impeached by mere *ex parte* affidavits.

WRIT OF ERROR to the Circuit Court of Crawford county; the Hon. W. C. JONES, Judge, presiding.

Messrs. OLWIN & ALLEN, and Messrs. PARKER & CROWLEY, for the plaintiff in error:

If Hughes killed Joseph, as he honestly believed, to save his own life or prevent his receiving great bodily harm, the killing was justifiable. *Campbell* v. *People*, 16 Ill. 18; *State* v. *Burke*, 30 Iowa, 331; *Schnier* v. *People*, 23 Ill. 17; *Maher* v. *People*, 24 id. 141; *Adam* v. *People*, 47 id. 376; *Roach* v. *People*, 77 id. 25; *Steinmeyer* v. *People*, 95 id. 383; 2 Wharton on Crim. Law, secs. 1019, 1021; 1 Bishop on Crim. Law, secs. 383, 384; *Grainger* v. *State*, 5 Yerg. 459.

If the defendant, under the belief that he was in danger of losing his life or suffering great bodily harm, killed the deceased, it is justifiable homicide. Apparant danger is suffi-

cient.    *Campbell* v. *People*, 16 Ill. 19; *Roach* v. *People*, 77 id.
25; *Steinmeyer* v. *People*, 95 id. 383.

Prior threats will justify a defendant in resorting to self-
defence when otherwise he would not be justified.    *Cahill* v.
*People*, 106 Ill. 621.

There need not be actual danger of great bodily harm if
the party acting in self-defence honestly believed there was.
*Cogne* v. *Commonwealth*, 2 Wright, 265; *Campbell* v. *People*,
16 Ill. 18; *Meredeth* v. *Commonwealth*, 18 B. Mon. 49; *State*
v. *Sloan*, 47 Mo. 504; *Pond* v. *People*, 8 Mich. 150; *Patten* v.
*People*, 18 id. 314.

Hughes' expressions of sorrow after the homicide, show
it was not premeditated, but done in self-defence.    *Allen* v.
*People*, 77 Ill. 487.

The court erred in not permitting George Elliott to testify as
to non-communicated threats.    *Campbell* v. *People*, 16 Ill. 18.

If a juror states on his *voir dire* that he has no opinion,
when in fact he had, it will authorize a new trial.    *Byars* v.
*City of Mt. Vernon*, 77 Ill. 470; *Davison* v. *People*, 90 id. 226.

Mr. GEORGE HUNT, Attorney General, for the People:

The first assignment questions the correctness of the six-
teenth instruction given on behalf of the People.    That instruc-
tion tells the jury to disregard uncommunicated threats, and,
under the circumstances of this case, was correct.    Plaintiff
in error courted all the danger, real or apparent, that sur-
rounded him at the time he killed Victor Joseph, by going
out of his store on a hostile mission, and armed with a deadly
weapon.    He was in the position occupied by Wilson, in *Wil-
son* v. *People*, 94 Ill. 324.    "His peril (if any) was courted,
that he might have an opportunity to gratify his malice."
There was no act of deceased shown, tending to manifest any
purpose to execute any threat, if he had ever made one.    There
was no act of deceased shown to which threats could give
character.    *Forbes* v. *Snyder*, 94 Ill. 374; *Adams* v. *People*,

47 id. 376; *Cummins* v. *Crawford,* 88 id. 312; 1 Wharton on Crim. Law, sec. 1027.

The wrongful acts of the plaintiff in error brought on the collision between himself and Victor Joseph, (if there was a collision,) and he can not avail himself of the right of self-defence for the purpose of taking the life of Joseph, even though he might have been the assailant. *Adams* v. *People,* 47 Ill. 378; *State* v. *Neely,* 20 Iowa, 116; Russell on Crimes, 718, 719; *Kinney* v. *People,* 108 Ill. 519.

Unless it be shown that the plaintiff in error was prejudiced by the sickness of the juror, the verdict should stand. *Davis* v. *People,* 19 Ill. 78; *Reeves* v. *People,* 30 id. 256; *Miller* v. *People,* 39 id. 457; *Adams* v. *People,* 47 id. 376.

The evidence that a juror has sworn falsely on his *voir dire* must clearly preponderate in establishing the fact, before a court will, for that reason, disturb the verdict of the jury. *Davis* v. *People,* 90 Ill. 221.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

At the March term, 1884, of the circuit court of Crawford county, Daniel Hughes was indicted for the murder of Victor M. Joseph. On the trial, at a subsequent term of that court, defendant was found guilty, by the jury to whom the cause was submitted, of the crime of manslaughter, and the punishment at service in the penitentiary was fixed at a period of twelve years. A motion for a new trial, supported as to some grounds by affidavits, was made, and was, after due consideration by the court, overruled, and judgment pronounced on the verdict. Defendant brings the case to this court on error.

The defence in the trial court seems to have been rested mainly on two grounds: First, that the killing was done in self-defence; and second, that defendant was insane at the time, and was not therefore subject to punishment as for crime. It is for these reasons it is insisted in this court it

was error in the circuit court to refuse a new trial, and that the present judgment should be reversed.

The record is quite voluminous, but the evidence it contains has been subjected to the most careful study. It is seen the testimony relating to the homicide is very brief, and contains very little that is conflicting. No one saw the fatal shot fired. The killing took place at about nine o'clock in the evening of the 11th of December, 1883. Just before the shooting, defendant was in his drug store, with a brother of deceased. They were talking about deceased, whom defendant seems to have thought was one of a party that had subjected him to great indignity about a month previous to that time. The conversation that took place shows defendant entertained very intense hatred to those persons who had outraged him, and deceased was one of the suspected parties. It seems defendant and Herschel Joseph were in the store of defendant, and had the door locked and the lights put out. It was, however, a very bright moon-light night, so that any one passing the windows could be readily recognized. Some one passed and defendant inquired who it was, and was told it was deceased going to see the mail carrier to ascertain if he could ride with him the next day to Robinson. Presently the deceased returned, and probably looked into the store through the glass in the doors, and passed on, and as soon as he had passed, defendant pulled out a revolver and said to Herschel Joseph, "you remain here till I come back," and unlocked the door and went out. It was but a brief moment before the report of a pistol shot was heard. Immediately Herschel Joseph went out and met defendant, who told him he had killed his brother. The shot fired by defendant took effect in the head of deceased, and death ensued almost instantly. When the body was found both hands of deceased were in his pockets. He had no weapons of any kind on his person. There is some conflict as to what defendant said to Herschel Joseph just after the fatal shot was fired, but

assuming either account of what was said to be true, it does not seriously affect the merits of the case.

Without entering upon any close analysis of the testimony, it is sufficient to say that after a most careful consideration the conclusion reached is, it wholly fails to sustain the theory, the killing was done in self-defence. Had defendant remained in his store, there is no pretence deceased would have interfered with him in any way whatever. He had passed by the store without giving defendant any cause of complaint. Surely when one goes out in search of his enemy, and kills him when found, it can not be said it was done in self-defence. Nor has the suggestion defendant went out to ascertain whether any injury was being done to his property, anything in its support. The evidence shows, past all doubt, the killing was done some considerable distance from his store-house. He must have gone in search of deceased. The law will not permit a person to follow up his enemy, and if an encounter ensue, justify the killing as being done in self-defence. In this case the evidence tends to show no encounter ever took place. Going upon the street where he knew deceased was, and on meeting him, defendant commanded him to throw up his arms, and because he did not do it he shot him. The evidence tends to show a deliberate purpose to kill deceased, rather than it was done in self-defence, and so the jury must have found. That conclusion seems to be best sustained by the weight of the evidence. At least there is no reason, in the opinion of this court, for setting the verdict aside on that ground.

Most of the testimony in the record is in regard to the condition of the defendant's mind,—whether he was sane or insane at the time of the homicide. This has also been subjected to the closest scrutiny. It is seen it is in a measure conflicting, but the weight of the entire evidence seems to be with the conclusion reached by the jury. Defendant was a practicing physician, and had a drug store which he at-

tended himself. Since he had a partial paralysis, some of his neighbors, physicians as well as non-professional persons, think he was not exactly right in his mind,—certainly not as strong as he was before his sickness. Others could see no difference in his mental condition. Physicians that were well acquainted with him and saw him every day, testified they thought he was entirely sane. There would seem to be much good sense in the statement of one of the physicians when he says the "idea of insane impulse without insanity is unreasonable," and then he added: "There can be no such condition as a person being sane one moment, insane the next, and sane again immediately after." This witness further says, "insanity is a disease of the brain," and expresses his disbelief of the idea the "brain can be diseased one moment and sound the next." The theory is advanced, "if insanity exist at all, it will continue to exist until the cause is removed, and will manifest its presence at intervals." How this may be can only be known to such persons as have made such matters as mental diseases the subject of study. All the medical witnesses seem to agree that in what they term "hemiplegia," the "mind is generally weakened." One of the physicians examined as a witness for defendant says, "there is not much difference between a person whose mind is weakened by hemiplegia and any other weak-minded person." It may be, and is doubtless true, defendant's mind was weakened, or perhaps impaired, to some extent, by the attack of paralysis suffered, but that he was rendered insane by it, is not made to appear from the evidence. What occurred just before and immediately after the homicide, shows most conclusively defendant knew what he purposed to do, and what he had done. Of this there can not be the slightest doubt. The evidence singularly fails to show defendant was in that mental condition that would relieve him from the consequence of his acts. The finding of the jury on this branch of the case is well sustained by the evidence.

It is assigned as error on the trial, that one of the physicians examined on behalf of the People was permitted to give it as his opinion that defendant was sane when he killed deceased. No exception was taken, on the trial, as to the giving of that testimony, and the objection it was error can not be considered in this court. The rule on this subject is well settled, and the point made need not be elaborated.

It is also insisted it was error in the court to refuse to admit the evidence of the witness Elliott, showing threats against defendant, after defendant stated threats had been communicated to him. After stating he had been acquainted with deceased for about a year before his death, the witness was permitted to and did state he had heard Victor Joseph make threats against Dr. Hughes. The witness was then asked to "state what they were." It seems this question was objected to as being improper, but the objection was "overruled." Still it does not appear the witness made any answer to it. The question was then asked, "Have you heard the deceased, Victor Joseph, make any threats against the defendant, Dr. Hughes, now on trial?" This question was also objected to, and the objection sustained. There is one obvious reason why the ruling of the court was entirely correct. The witness had just stated he had heard deceased make threats against defendant, and there was no reason why he should be asked to repeat the same thing. Had the witness been asked to state "what they were," as the court had just decided might be done, no doubt the witness would have been permitted to answer. This was not done, and thus in the ruling of the court there was no error.

It is also assigned for error that three of the jurors impaneled to try defendant were incompetent, for the reason they had previously "formed and expressed" opinions as to his guilt. Affidavits filed in support of the motion for a new trial on this ground, do tend to show one or more of these jurors had previously expressed opinions concerning the guilt of

22—116 ILL.

defendant, but the jurors implicated deny in the most positive manner they ever made the statements attributed to them. Their affidavits in this respect find some support in the affidavits of persons alleged to have been present. Considering all the affidavits together, it is not thought it is sufficiently proved either of the jurors whose competency is now called in question had previously formed any such opinions concerning the guilt of defendant as would disqualify them, or either of them. A verdict ought not to be set aside on such grounds, unless it is made to appear, from satisfactory evidence, the jurors had previously "formed and expressed" opinions hurtful to the defence. Scarcely a criminal case comes to this court where the same objection to the competency of jurors is not taken, founded on mere *ex parte* affidavits. Such affidavits are a most unsatisfactory mode of establishing any fact· in a case. The parties making them are subject to no cross-examination,—one of the most potent methods ever adopted to elicit truth and to detect falsehood. Besides that, a mere casual remark concerning any matter may be imperfectly understood or not accurately remembered. Many cogent reasons readily suggest themselves why the testimony as to such previously expressed opinions by persons called as jurors should be of a clear and satisfactory character, otherwise a verdict fully warranted by the evidence might have to be set aside, and the ends of justice defeated.

Another ground of error insisted upon is the fact one of the jurors became suddenly very ill,—so much so as to render him incompetent, for the time being, to comprehend what was transpiring. It does not seem to have been noticed the juror was sick until the case had been concluded, and until after the jury had retired to consider of their verdict. Then the juror had a spasm or fit that rendered him unconscious for a few hours. The affidavits of a number of the jurors were taken, and they all show no discussion of the case was had by any of them until after the juror was so far restored that

he could and did take part in their deliberations. That being so, there was nothing in the sickness of the juror that was prejudicial to defendant. It is fully shown defendant had the benefit of the judgment of this juror as well as that of all others in their deliberations on his case.

The point is made against the validity of the present conviction, the record does not show the indictment against defendant was returned by the "grand jury" in open court. The additional transcript of the record filed in this court, on leave given for that purpose, does show the indictment was returned in open court by the "grand jury," as the law requires shall be done. In the original transcript of the record filed in this court it was recited: "And now, on this 6th day of March, A. D. 1884, and the fourth judicial day of the March term of the circuit court of Crawford county, Illinois, duly selected and sworn, and returned into open court the following true bills of indictment, all of which are indorsed by the foreman thereof as and for true bills,"—among which was this indictment against defendant for murder. The additional or amended transcript filed in this court contains the same exact words above quoted, with the addition, "came the grand jury." It is said these words, "came the grand jury," have been inserted in the record since the original transcript was filed in this court, and copies of affidavits stating that fact have been filed with the argument in this case. The additional transcript is duly certified by the clerk of the court in which the record remains, as being correct, with the words, "came the grand jury," in it. His attestation imports verity, and it can not be impeached by mere *ex parte* affidavits filed in the clerk's office. They constitute no part of the record, and can not be considered by this court. But aside from this view, this court does not wish to be understood as holding, or even intimating, that the original transcript of the record was so defective it would not sustain the conviction. The context shows plainly, and correctly read it means, "came the

grand jury" into open court to present indictments, and that is sufficient. The objection taken to the record in this respect is too subtle to be entertained by this court.

No error is perceived in the record that in the slightest degree affects the merits of the case, and the judgment of the circuit court must be affirmed.

*Judgment affirmed.*