## STATE v. DRAPER

No. 5409.   Decided November 24, 1933.   (27 P. [2d] 39.)

*Lewis Larson* and *L. Leland Larson,* both of Manti, for appellant.

*Joseph Chez, Atty. Gen.,* and *John D. Rice,* Deputy Atty. Gen., for the State.

STRAUP, C. J.

The defendant Mendon Draper was convicted of murder in the first degree, and appeals. The chief assignments of error are: (1) That the evidence is insufficient to support the charge of first degree murder, to show that the homicide was committed with premeditation or deliberation or with malice aforethought, etc.; (2) errors in the charge; (3) error in denying the defendant's motion for a new trial on the ground of disqualification of one of the jurors.

The substance of the information is that the defendants Mendon Draper and Ivadell Jensen, on the 12th day of April,

1932, in Sanpete county, with "deadly weapons," the description and character of which were unknown, with intent to kill, did unlawfully, feloniously, and with premeditation, deliberation, and malice aforethought, etc., strike and beat Andrew N. Bjerregaard, thereby inflicting upon him mortal wounds from which he then and there died. The defendants were tried separately. Draper was tried first and convicted of murder in the first degree with a recommendation by the jury of life imprisonment. In accordance therewith he was sentenced by the court to the state prison at hard labor for life. Ivadell Jensen later was tried on the charge and acquitted.

Evidence was given to show that the deceased was about 82 years of age, in good health and in good physical condition for a man of his age, still capable of doing ordinary field work. He was about five feet seven inches tall, rather stocky and of heavy build. His weight is not given. He was president of a bank at Ephraim where he lived and where he also was engaged in farming. He lived alone in a house of several rooms in Ephraim; his wife having died several years prior to the homicide. Ivadell Jensen was his daughter. She had been married and was the mother of four children. Four or five months, at any rate less than six months, prior to the homicide she was granted an interlocutory decree of divorce from her husband and was given the custody of the children. She with her children lived alone in a house at Ephraim about a block from where the deceased lived. Draper was 26 years of age, unmarried, lived with his father at Ephraim about six blocks from where the deceased and Mrs. Jensen lived. He had no particular trade or occupation. He worked for his father and for others on odd jobs on farms, and herding sheep and cattle. He put his character in evidence. A number of credible witnesses testified his reputation was good. No evidence was given to the contrary.

Evidence was given to show that an attachment for each other existed between Draper and Mrs. Jensen. For six

months or more prior to the homicide, Draper on various occasions in the daytime was seen about or going to Mrs. Jensen's place. About a month before the homicide he helped her put in her spring garden. On another occasion he assisted her in moving objects in the cellar; on other occasions he inquired about building a fence between her lot and an adjoining lot; asked the deceased to let him have a team to do some plowing on her premises, which the deceased declined to let him have. Further evidence was given to show that Draper and she intended to get married, but she desired the consent of her father. On one occasion the deceased stated that before they got married they should at least wait until the interlocutory decree of divorce became final. Other testimony was given to show that the deceased did not look favorably upon and was opposed to the marriage; that on one occasion Draper asked to talk to the deceased who declined to talk to him, but no apparent unfriendly disposition was manifested by either; that on another occasion Draper applied to the deceased to work for him at hay when he told him he had all the help he needed. Another witness testified that about five or six months prior to the homicide Mrs. Jensen, in the presence of the defendant, stated to the witness that the deceased had "sent or kicked Mendon (the defendant) off the place," of Mrs. Jensen's, "and raked him up one side and down the other and told him to go and not come back; that Mendon followed him across the street and asked him what he had against him, and the deceased stated, 'No, nothing, but I don't want you around my place or with my daughter,' " and addressing the defendant, Mrs. Jensen asked him if that was not so, to which he assented. Another witness testified that in the fall prior to the homicide the witness and the defendant were talking about the depression, etc., and in connection therewith the defendant jocularly remarked that there was no chance for "the young fellows until some of the rich devils were killed off"; that the witness in a jocular manner asked the defendant where he would begin, and he

answered, "Why, on Andrew Bjerregaard." Still another witness testified that in early January prior to the homicide, the defendant accosted the witness and asked him, "Why are you talking about me for?" to which the witness replied he had not been talking about him and stated he knew where that "came from, that it came from Ivadell (Mrs. Jensen), and I told her that I would sooner see her marry a skunk than you," that "Uncle Andrew (the deceased) didn't approve of it either," whereupon the defendant stated, "I will get that old son of a bitch and I'll get you too if you don't keep your mouth shut."

Further evidence was given to show that the defendant in the forenoon of the day of the homicide worked in a field on a ditch with ten or fifteen other persons, among whom was a brewer of beer who told the defendant he had some beer but it was rather fresh; that the defendant told him he that evening would call for a gallon of it. On the afternoon of that day the defendant did not work. He stayed at home, went up town, and at two automobile service stations obtained two cans of waste oil from crank cases of automobiles and was seen carrying a can of oil in his hand towards his father's house. Later in the afternoon and while it was yet daylight he was seen going in the direction of Mrs. Jensen's place carrying a can in one hand and a gunny sack with some objects in it thrown over his shoulder. At about dark he, with a gallon jug in a gunny sack, called at the house of the brewer and got a gallon of beer. He remained there about fifteen or twenty minutes during which time he drank five or six glasses of beer. He left his watch as security for the payment of the beer, put the jug in the sack, and departed.

The homicide was committed on the night of April 12th. That day the deceased did some field work and was last seen alive, except by the defendant, at the deceased's granary about 6 or 7 o'clock in the evening. A light was seen in his house some time between 8 and 9 o'clock. The next morning at about 8 o'clock his dead body was found on

the floor of the kitchen. The kitchen is rather a large room a little over 17 feet by 15½ feet. It had two outside entrance doors, one on the north and one on the south side, and a door leading from the kitchen to an adjoining room. Evidence was given to show that about a year prior to the homicide all the doors of the house were equipped with inside bolts. When the body of the deceased was discovered all the doors were either locked or bolted except the north door of the kitchen. The principal furniture of the kitchen consisted of a kitchen stove or range, the oven door of which the next morning was found down about ten inches from the floor, and pieces of stove wood either in the oven or on the oven door. The door of the ash receptacle was broken or knocked off and found lying on the floor nearby. In the room were also a leather sofa, a sanitary iron or wire couch or bed with an adjustable side, an armchair nearby, a flour bin, a round table near the center of the room, another table to one side, a chair, a sink, and a washstand. The farm of the deceased was leased to one of his sons. About 8 o'clock on the morning of the 13th the son and a grandson of the deceased called at the deceased's place to do the morning chores. The body of the deceased was first discovered by the grandson. He entered the kitchen at the north door, which was closed but not locked or bolted. When he opened the door he was met with a volume of heavy smoke. He immediately called his father who entered the kitchen, saw the deceased dead on the floor, and aroused the neighbors. He could not remain long in the room because of the smoke and was somewhat overcome by it and had to go outside. The sheriff and a doctor were immediately summoned. The body of the deceased was lying on the floor of the kitchen about six feet from the sanitary couch with his head about two or three feet from the reservoir of the stove. A feather mattress on the bed and the bed clothing with oil having been poured over them were on a smouldering fire. That was put out by neighbors who came upon the scene. Blotches of blood were found at different places all over the floor of

the kitchen; some under the table, some near the stove, some, a sort of a spray, on the four walls of the room, and some even on the ceiling. Some of the blotches of blood on the floor had the appearance as though something had been dragged through or over them. A large pool of blood was under the head of the deceased where the body was lying. A considerable amount of blood and oil was found on the feather mattress and bed clothing, and a considerable amount of blood on the springs underneath the mattress and on the floor underneath the bed. The deceased had on an undershirt, a work shirt, and drawers. A stocking was on one foot; the stocking of the other foot off and hanging on a garter. The deceased's trousers and other apparel were on the sofa, his shoes near the stove. Oil had been poured and scattered on the mattress and bed clothing and on the body of the deceased. The body was burned about the hands, arms, face, and on the front and back of the upper part of the body. There were blisters from burns on the arms, shoulder, and on the front and back of the body. Feathers from the mattress, some of them partly burned, were found scattered on the floor between the body where it lay on the floor and the bed; some of them matted with oil and blood in the palm of one of the deceased's hands. Thirteen lacerations, eight of which were major cutting the scalp to the bone, were found on the side and back of the deceased's head; a fracture of the skull in the parietal and extending down the temporal region, a basal fracture of the skull in the occipital region, and a fracture or crushing of the third and fourth cervical vertebrae, a severance or crushing of the spinal cord, and an injury to the phrenic nerve.

A common butcher knife about eleven inches long including the handle was found on the sanitary couch or bed. A stick of stove wood with blood and hair on it was found lying on the floor or on the stove. The stick was a split from a limb of an aspen tree. The stick was about a foot long with a sort of raise or knot at one end. It was about two inches wide and about an inch and a half thick and

weighed not more than one-half pound. A two-quart oil can was found on a chair or table in the kitchen. Physicians testified that the extent and character of any one of the fractures were sufficient to cause unconsciousness and death, and that the fracture at the base of the skull, or of the vertebrae, caused instant unconsciousness, a total destruction of self-movability and almost instant death; that some of the scalp lacerations were connected and several of them could have been made with one blow of an instrument and could have been made with a stick of wood such as found on the floor or on the stove with blood and hair on it. They, however, expressed opinions that it was not probable that the fractures, especially at the base of the skull or of the vertebrae, could have been made with such a stick of wood, or by the deceased falling from a standing position and striking his head or neck against the stove or other object in the room. They further stated that none of the blisters on the body of the deceased could have been caused by burns after death and that all of them were caused while the deceased was still alive.·

The state gave further evidence to show that the defendant, on the morning when the homicide was discovered and while the sheriff and others were still about the premises, visited the place and expressed sympathy with the son and other relatives of the deceased. He, however, made no statement of any kind as to his connection with the homicide, or of having any knowledge as to how it was committed. In the afternoon of that day the sheriff and county attorney called at the house of the father of the defendant and asked the defendant if he was willing to give an account of his whereabouts the previous day. He readily consented to do so. In response to questions asked him he stated that in the forenoon of that day he worked on a ditch and in the afternoon went up town and while there recalled that Mrs. Jensen had previously told him to get some waste oil to put on her pig because it was lousy; that he got some oil, took it to his father's place, that he did not get two cans, only

one; that at the first station where he applied for oil he found it too thick and went to another station where he got lighter oil, he thought about a quart, and that evening, about 7:30 o'clock, he took it to Mrs. Jensen's place and poured it on the pig. The sheriff, noticing some scratches or blotches on the defendant's powdered face, asked him about them. The defendant told him he received them from willows working on the ditch. On the afternoon of the next day the sheriff had a further conversation with the defendant at his father's house and told him he would have to put him under arrest, to which the defendant readily yielded. On the 18th at the jail at Manti, the county seat, the sheriff and the county attorney had a further conversation with the defendant. He was warned as he was before that anything he might say would be used against him, that he was not required to say anything, unless he chose to do so. The defendant again told the sheriff substantially what he had told him on the previous occasions. When shown a two-quart oil can found in the kitchen the defendant stated it was the can or looked like the can in which he got waste oil at the service station. He further told the sheriff that at about 8 o'clock in the evening of the 12th he carried a burlap bag with a gallon jug in it and the oil can in his hand and went to the brewer to get some beer which he had arranged to get in the forenoon of that day, that he got the beer, left the oil at the brewer's place, and did not know what became of it. Later the sheriff saw the defendant alone and told him, "You are lying to me; it won't get you anywhere and you might as well tell the truth," whereupon the defendant said, "Well, sheriff, I'll tell you how it happened." The defendant then stated: He went over to the house of the deceased to talk to him about getting married to Mrs. Jensen; that the deceased got off the bed and started toward the stove, locked the door, then stepped back, got a butcher knife and said, "God damn you, I guess I'll have to kill you to get rid of you"; that the deceased made for him and grabbed him, that the defendant grabbed a

stick of stove wood and hit him not more than three times on the head, that the deceased fell to his knees, but "I didn't have anything to do with scattering the oil or setting the fire"; that he was not drunk, the "beer had no kick in it." On the 20th the sheriff had a further talk with the defendant. At that time the defendant, in addition to what he had theretofore told the sheriff, stated that after he got the beer he and Mrs. Jensen talked about getting married and had a few glasses of beer and that he then went out to pour oil on the pig. "And then we (the defendant and Mrs. Jensen) went over to see Mr. Bjerregaard and when we stepped in the house he said, 'Well, damn you, I am going to kill you,' and grabbed a butcher knife and made for me," and that he then hit the deceased on the head with a stick of stove wood not more than three times. The sheriff stated to him he had a piece of cloth torn from the defendant's clothes and asked him if it would not be possible that it was a part of his underwear, whereupon the defendant said it was not; that he had burned his clothes; that they were pretty bloody. He then was asked if it was not possible that Mrs. Jensen knocked on the door and called to her father, to which the defendant replied, "I don't remember just how it was." He further was asked if it was not possible that during the fight the deceased struck Mrs. Jensen across the leg. The defendant replied he did not "think so, that she was trying to keep out of the way," that the defendant had two to protect, that after the fight, he picked the deceased up, put him on the bed and said to him he was sorry "it had come to this," and that he and Mrs. Jensen then went back to her place. He further was asked if it was not possible that Mrs. Jensen worried about her father and sent her son back to his place, to which the defendant replied he did not think so.

Further evidence was given by the state that about the first of May, underclothes, a black shirt, a pair of overalls with blood and feathers on them, and a pair of rubbers of the defendant, covered over about two feet with a burlap

sack, paper, magazines, old cans and dirt, were found in the bottom of an outhouse five or six feet deep on the premises of Mrs. Jensen; that several keys tied together were found in the pocket of the overalls, one of which was a skeleton key and unlocked some if not all the doors of the deceased's house; that a small piece of underwear was found hanging on the side of the stove in the kitchen which did not match the underwear of the deceased, but matched the underwear found in the outhouse. The state gave further evidence to show that blotches of oil were found on the pig in the pen of Mrs. Jensen and blotches of oil on some of the boards of the pen, which the sheriff roughly estimated to be about six teaspoonfuls of oil, though he was quite indefinite and uncertain as to the quantity.

The defendant was a witness on his own behalf. By his testimony he admitted the killing of the deceased but claimed the killing resulted in necessary self-defense. He in substance testified that in the forenoon of the 12th he worked on a ditch; that in the afternoon he remained at home and went up town to service stations, there talked to some persons, and while there recalled Mrs. Jensen had previously asked him to get some waste oil to put on the pig; that he asked for some oil and was told to help himself; that at the first station he found the oil too thick and then went across the street and got oil that was thinner and carried it home in a can to his father's place. At about 7 o'clock in the evening he got ready to go to Mrs. Jensen's place, and before he left he took a drink of whisky. He in a gunny sack put a gallon jug to get beer, an old shirt, a pair of overalls and a pair of rubbers to put on to dope the pig, and finding the can in which he got the oil could not well be carried in the sack without spilling, he put some of the oil in a smaller can and put it in the sack and carried the larger can with oil in his hand, and the sack on his shoulder; that he arrived at the house of Mrs. Jensen somewhere about 8 o'clock and put the sack with its contents on her back porch. He remained there five or ten minutes talking

with Mrs. Jensen, then took the sack with the jug and went to the brewer's place, leaving the old clothes and oil in the washhouse at her place. He got the beer and returned with it to Mrs. Jensen's place. He drank five or six glasses of beer at the brewer's. He drank some more at Mrs. Jensen's place. She drank a little herself. He then concluded to dope the pig, changed his clothes for such purpose, putting on the shirt, underwear, and overalls and rubbers which he had brought with him in the sack. He testified he was then "kind of drunk, pretty drunk"; that Mrs. Jensen went part way with him to the pen, then turned back and went in the house. He doped the pig with the oil, but used only what he had in the smaller container. The larger can with the oil he left in the washhouse. When he got through doping the pig he, without saying anything to Mrs. Jensen, concluded to go to the home of the deceased to talk to him about his marriage with Mrs. Jensen; that he and Mrs. Jensen had been talking about getting married and that she thought they ought to have the consent of the father. He further testified he was feeling "kind of good," felt rather encouraged, and thought he would go over to the deceased's place and talk the marriage over with him. He testified that it was then about 9 o'clock in the evening. He saw a light in the deceased's house and knocked on the north door of the kitchen. The deceased asked, "Who is there?" the defendant answered, "It is Mendon." The deceased asked him what he wanted. The defendant replied, "I want to talk to you." The deceased stated it was rather late, to which the defendant replied, "If it is too late I will go," whereupon the deceased invited him in. The deceased was sitting in the south portion of the kitchen and apparently had been reading. The defendant testified he was there about half an hour or an hour; that the main thing talked about was the marriage between the defendant and Mrs. Jensen; that the deceased sitting in the chair near the bed got somewhat excited and angry during the conversation; the defendant sat on the leather sofa. He further testified the deceased

several times called him a drunkard and said to him, "You are drunk now," to which the defendant replied he had "a drink or two"; that the deceased called him and his father "Mormon scums," and seemed to get very angry; that the defendant told him he did not come over to have any trouble or any hard feelings, that he came over to talk to him about getting married and that he "wanted to be friendly and good about it."

The defendant, as his testimony is abridged in the abstract by his counsel, further testified:

"The more I would talk to him the more angry and hateful he would get, and I sat there on this leather couch and he sat there on a chair by the bed. At last he got up and walked over to the stove, and from there on over to the door, and I got to feeling rather sick and groggy and I got up and was going out then, and as I was going to the door I stumbled there in front of the stove and I fell, and as I fell, Mr. Bjerregaard struck me one, and as I went to get up he stooped over me, and he had a knife, and he was raving. As I tripped, I received a bruise on the shin of my left leg. Some of the mark is still there. (Exhibiting his shin to the jury.) As I raised up, Mr. Bjerregaard made some remark, 'God damn you, I'll kill you,' or something like that. He struck me along the left side of the head while I was down, but I don't know what he struck me with. I do not remember of anything more before I got up, except he made these threats that he would cut me all to pieces, he would kill me. I believe he was angry then. He kept crowding me and shoving me. I believed that he intended to injure me at that time. I don't know where he got the knife from. I grabbed hold of his hand around the wrist with both of my hands. Then he started crowding me, and I tripped and went over backwards, and Mr. Bjerregaard lit on top of me. It was right in front of the stove. I don't have a judgment as to what tripped me. The oven door was open. It might have had something to do with my tripping. There was some wood there in front of the stove on the oven. When I fell the second time, Mr. Bjerregaard was on top. We tussled there on the floor for a time, but I couldn't say just how long. I don't know just what happened next, but as near as I can remember, we were there on the floor, I got hold of a stick of wood some way and I started to using that stick of wood guarding that hand, and kept a begging and pleading for him not to do that, but he kept on making threats and cursing, and so I started striking him with this stick of wood while he was on top of me. We fought prac-

tically all over the room. Mr. Bjerregaard seemed to be stronger than I was. I didn't have an opportunity to get away from him. I struggled and tried to get away from him, but he had hold of me. He kept fighting and trying to keep his arm around my neck all the time, and holding my clothes. We were down and up practically all over the room. At the last, about to the end of the fight, as I remember it, I struck Mr. Bjerregaard quite a heavy lick. As I struck him we both fell and we struck the stove. I took hold of Mr. Bjerregaard and I said, 'My God, man, have I hurt you?' or 'what the hell has happened?' and he wouldn't talk and I could get no reply from him, and I continued to talk to him and move him, and at last I got him over onto the bed some way, and I talked to him there for a few minutes and I couldn't get any reply. I believed he was dead then. I turned and walked out of the house. I was damned scared. Then the thought came to me what I should do, or what I could do, and I thought I would take and burn the place down, and cover up the evidence of the homicide."

He further testified that he then went across the street to Mrs. Jensen's washhouse, and, without seeing or saying anything to her, he got the remainder of the oil, went back across the road and decided to burn the place down; that when he got back Bjerregaard was on the bed where he had left him; that he cut the mattress open with the butcher knife, scattered the oil on the bedding and mattress where the deceased was lying, and set fire to it; that he believed Bjerregaard was dead, and after setting fire to the mattress and bedding, he left and went over to Mrs. Jensen's washhouse, changed his clothes, washed his face where he thought there might be blood on it, jammed the old clothes and stuff down the sack and threw them down the outhouse thinking they would not be found there and covered them with paper and tin cans found lying about there; then without seeing or saying anything to Mrs. Jensen he went home, cleaned up, put on clean underwear, changed his stockings and his shoes, washed and powdered his face and then went back to Mrs. Jensen's place. She asked him where he had been. He told her he had been home, but did not tell her anything of having been at her father's house or what had occurred there, and after talking a little while with her they

had coffee. He stayed at her place until about 1 o'clock a. m. and then went home.

He further testified he did not remember pouring oil on the deceased or on his clothes, but poured and scattered the oil on the bed where the deceased was lying and set fire to it and then went right out; that when he went over to see the deceased he did not know that he was opposed to the marriage; that he at no time prior thereto had asked or talked to him about it; that he had no ill will or feeling against the deceased, and did not know that he had any against him. He denied that the deceased at any time had ordered him away from Mrs. Jensen's place, or to stay away from her, and denied making any of the statements testified to by witnesses for the state concerning the deceased, and denied that there was any trouble between him and the deceased. He further testified that the keys found in his overalls were hanging on the inside of the door when he entered the house, and when he left he took them with him. He further testified Mrs. Jensen was not with him at any time at the deceased's place on the night of the homicide, that they had not discussed or talked about any such affair whatever, that she had no knowledge that he had gone or intended to go to her father's place, or that she had any knowledge of the homicide until the next morning when she learned of it for the first time through others; and that what he told the sheriff about Mrs. Jensen going or being with him at her father's place on the night of the homicide was not true. He further testified that at first he did not want to tell the sheriff his connection with the homicide and did not then tell him all about it; but at the last conversation, he told the sheriff substantially how the homicide was committed, except he denied to the sheriff scattering the oil or setting fire to it, and falsely stated to him that Mrs. Jensen went with him to the deceased's house.

A son of the deceased called as a witness for the defendant testified that about a year prior to the homicide he assisted the defendant in putting waste oil on one of the

pigs of Mrs. Jensen to destroy vermin, and that such treatment was not uncommon. The sheriff having testified for the state that he did not see any blood or hair on any part of the stove, the defendant called a witness who testified that on the morning after the homicide and while the sheriff and others were still making inspections and examinations, the witness saw several small smears of blood near one of the front corners of the stove about eight inches from the floor and some hair on one of the smears. The father of the defendant testified that the defendant on the night of the 12th came home and entered the house a little after 9 o'clock, after the father had gone to bed; that they spoke to each other; that the defendant went to his room and remained there five or ten minutes, then went to the kitchen and shortly thereafter left the house. A physician was also called by the defendant who in substance testified that the length of time a person could live after having received the described injuries inflicted on the deceased would depend upon the severity and extent of the fractures and dislocation, the extent of the injury to the phrenic nerve, the spinal cord and hemorrhages in the brain. That if the phrenic nerve and its branches were entirely destroyed, death would result immediately. If the nerve and its branches were merely injured and to some extent still functioning, the spinal cord merely injured and not severed, with the fracture of the skull and dislocation of the vertebrae, it could not be told definitely just how long a person would live, probably five or ten minutes though death might be hastened from severe hemorrhages in the brain.

We thus, so far as material, have given the substance of the testimony adduced both on behalf of the state and of the defendant. The contention of counsel for the defendant is that on the record the killing resulted, if not in self-defense as claimed by the defendant, from a combat and fight occasioned by a quarrel between the defendant and deceased, without malice on the part of the defendant and without deliberation, premeditation, or intent to kill; that the scat-

tering of the oil and setting fire to the bed and bedding was something conceived by the defendant through fright and bewilderment after the death of the deceased, "to cover up the evidence of the homicide," and that the fire in no particular contributed to the death which, as alleged in the information and as shown by the evidence, was caused solely from injuries inflicted upon the deceased with deadly weapons or instruments of some kind. The argument, in so far as it has any proper support, rests chiefly on the testimony alone of the defendant. Though on the evidence the jury should have believed or assumed that the defendant did not obtain the oil at the service stations with intent to use it for any purpose other than to destroy vermin on the pig of Mrs. Jensen, and not for any purpose for which the defendant thereafter used some or most of the oil at the deceased's premises, and that when the defendant called at the deceased's house on the night in question he did so to talk with the deceased concerning the marriage and to get his consent thereto and not with any intent to kill or injure him, yet the jury were not required to accept the testimony of the defendant as to the cause or the beginning of the encounter; and though the jury should have believed the deceased was the aggressor, yet that the defendant used more force than apparently or reasonably was necessary to ward off or prevent any assault upon him by the deceased. The mute evidences of blood all over the floor of the kitchen, under the table and other objects, even some on the ceiling, and the severe and numerous injuries inflicted on the deceased, indicate that a most terrific fight or encounter between the defendant and the deceased took place on that fatal night. To that effect is also the testimony of the defendant. Upon all the evidence the jury could have been justified in finding that the defendant and not the deceased was the aggressor, and that the latter and not the former but did what he could to protect himself; that the defendant beat the deceased into insensibility and when in a helpless condition killed him. The jury further were justified in

finding that the lacerations of the scalp, eight major lacerations cutting the scalp to the bone, which, if they did not render the deceased insensible, rendered him substantially helpless, and that such lacerations were inflicted before the more fatal fractures of the skull and of the vertebrae were inflicted causing almost instant death; and if the lacerations were inflicted after the fractures of the skull and vertebrae the defendant beat the deceased while he lay prostrate and helpless on the floor.

Further as to this: The jury may have found and were justified in finding that the testimony of the defendant in material particulars was inconsistent with indisputable facts and circumstances of the case. The testimony of the defendant is that after all the injuries were inflicted on the deceased, including the fractures of the skull and of the vertebrae, he believed the deceased dead, put him on the sanitary couch and left him there while the defendant went to Mrs. Jensen's premises to get the oil to set fire to the bed or premises of the deceased; that on his return the deceased, as the defendant testified, was still on the couch, and also when the defendant poured the oil on the bed and set fire to it. That the deceased at some stage of the homicide and after at least some of the wounds and injuries were inflicted upon him was put on the bed, or was on the bed when some of the injuries were inflicted, is clearly shown by the blood found on the mattress, on the bedding, on the springs of the couch, and on the floor underneath the couch. However, the next morning the deceased's body was found on the floor about six feet from the couch with a large pool of blood underneath his head where he was lying. If the deceased was put on the couch after the infliction of the basal fracture of the skull and of the vertebrae injuring or destroying the phrenic nerve and severing or crushing the spinal cord, causing, as testified to by the physicians, total destruction of self-movability and almost instant death, the jury could have found that the deceased could not and did not cast himself off the bed and on the floor six feet away. Because

of the blisters from burns on the body of the deceased and on his hands, arms, and shoulder, the jury further could have found that the defendant set fire to the bed and clothing on the body of the deceased while he still was alive. And from all of which the jury could have reached the conclusion that the defendant placed the deceased on the couch after the infliction of the scalp lacerations; and when the defendant returned with the oil and cut and ripped the mattress open and poured the oil upon it and on the bedding and set fire to them, the defendant discovered the deceased was not dead and either dragged him to the floor, or the deceased himself struggled off the bed, and that the defendant thereafter, with some instrument or weapon other than the stick of stove wood, inflicted further injuries causing the basal fracture of the skull and of the vertebrae. Such theory to some extent at least is corroborated by the opinions expressed by the physicians that it was not probable, some of them stated it was not reasonably possible, that such fractures were produced with the stick of stove wood found with blood and hair on it, nor by the deceased falling from a standing position and striking his head against the stove, and that such fractures were produced by some instrument or weapon other than with the stick of stove wood. Such, too, was the view of the trial court as expressed by him in a written opinion overruling the motion for a new trial.

Further as to this: From all the evidence in the case it was within the province of the jury to find that the defendant in the first instance when he went to the deceased's house took the can of oil with him with the intent to kill the deceased and then set fire to the premises, or to do so if the deceased refused to give his consent to the marriage. That the defendant, by setting fire to the building with the intent to destroy it and the contents therein, committed first degree arson, a felony, is in effect admitted by him. It thus was within the province of the jury, on all the evidence, to believe and find that, if the circumstance of committing the

arson was not a part of an original plan and design to take the life of the deceased, it with greater certainty pointed to an attempt to cover up or destroy the evidence of a malicious and felonious killing, than to a mere justifiable killing in self-defense. We thus are of the opinion that the evidence was sufficient to justify the verdict of first degree murder.

Now as to the charge of the court. The charge was full and complete, covering all the issues of the case, including all essentials of the charge and all included offenses, presumption of innocence, burden of proof, good character, and on all of the claimed defenses, including self-defense. The charge is unusually clear, specific, and complete, and in every particular safeguarded and protected all the rights of the defendant. The only complaint made of it is wherein the court charged that:

"All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, are principals in any crime so committed."

The complaint made thereof is that the charge assumed "that two persons were concerned in the commission of the alleged crime" and "in regard to persons who had advised or encouraged its commission"; and that it was error to give such an instruction, because there was no evidence that any one "was involved in the commission of the offense except the defendant." To support that the defendant cites the case of *State* v. *Baum*, 47 Utah 7, 151 P. 518, where it was held that such a charge may be proper in a proper case but was not there applicable to either the pleadings or the evidence. We think this case distinguishable from the Baum Case. From the statement heretofore referred to, made by the defendant to the sheriff, it could be inferred that both the defendant and Mrs. Jensen were involved in the commission of the offense, and that she was present at least a part of the time when it was committed. The defendant

by his testimony did not deny making such statement to the sheriff. He but testified that what he in such respect told the sheriff was not true. In the next place, the defendant here, different from the Baum Case, by his testimony admitted the killing of the deceased and that he was an active participant in the commission of whatever crime was committed. In the Baum Case the defendant was not a witness in his own behalf and made no admission as to any participation in the commission of the charged offense. The defendant by his testimony having admitted the killing and of being an active if not the sole participant therein, he could not have been and was not prejudiced by the abstract principle of law stated by the court substantially in the language of the statute. Nor can we see, nor is it pointed out, how the jury could have been misled thereby to the defendant's prejudice.

This brings us to the more serious question, one which the state concedes is the most serious, that of the claimed disqualification of one of the jurors. The juror resided in Ephraim where the alleged offense was committed. He was engaged in delivering gasoline to service stations from one town to another. On his examination on voir dire by the court he stated that he had read newspaper accounts of the case and heard it talked about on the street; that there was a good deal of street talk about it; that people congregated on the street and manifested much excitement about the affair; that he was told what had happened, that the deceased "had been killed, just what people were talking about"; that the details of what had happened in the deceased's house were related to him or in his presence and later heard that the defendants had been arrested "for it." When asked whether he had formed any opinion "concerning the guilt or innocence of this defendant (Draper) of the homicide," he answered, "I cannot say that I have." He further answered that from all he had heard or read he "still reserved forming any opinion," and that, if accepted as a juror, "all those things he had heard and read about the

case would not weigh in the scales either for or against the defendant," that he had no leaning one way or the other, that he could and would presume the defendant innocent, would require the state to prove him guilty beyond a reasonable doubt, and, if it failed to do so, the defendant should be acquitted.

Upon examination by counsel for the defendant the juror further answered that he was acquainted with the defendant and also with the deceased in his lifetime; that he did not know that he had talked with any one who pretended to know the facts of the case, "just heard people express their opinions as to how it looked, is all." Then he was asked:

"Q. From any conversations you had were you led to form an opinion as to the guilt or innocence either one way or the other of the defendant Mendon Draper? A. No. sir.

"Q. And you have none now? A. No sir."

He further answered he could enter upon the trial of the case, hear the evidence and the law, and render a fair and impartial verdict, and that he would not start out with any bias or prejudice one way or the other, and that he had "no opinion one way or the other in the matter."

A motion for a new trial was made on the ground, among other grounds, that after the verdict, it was discovered by the defendant and his counsel for the first time that the juror prior to being called in the box had formed and expressed opinions contrary to his statements on voir dire. In support thereof three separate affidavits of affiants, residents of the county and whose credibility or motive was not questioned, were filed on behalf of the defendant with respect to such prior statements made by the juror. One of the affiants deposed that on or about April 15, three days after the commission of the alleged offense, the juror at Ephraim in the presence of the affiant in substance and effect stated "that the killing of Andrew Bjerregaard was murder and that he knew that the defendant Mendon Draper

and that woman (Mrs. Jensen) were guilty and that there was no question in his mind about it." Another affiant deposed that on or about the 13th day of April at Ephraim the juror in the presence and hearing of affiant in substance and effect stated "that the killing of Andrew Bjerregaard was murder and that the defendants Mendon Draper and Ivadell Jensen were guilty." The other affiant deposed that the juror in the presence of the affiant at Monroe, Sanpete county, on or about the 26th of April, in response to questions asked him by the affiant, stated that "he thought that Mendon Draper and Ivadell Jensen were guilty of the murder of Andrew Bjerregaard and he answered me in substance and effect that he thought they were guilty." Affidavits also were filed by the defendant and his counsel that they had no knowledge of such or any statements having been made by the juror until after the verdict, and explained how and when such facts were thereafter discovered by them.

A counter affidavit was filed by the juror on behalf of the state in which he, in effect, deposed that at or about the time and place stated in the affidavits filed on behalf of the defendant he had a conversation with each of the affiants or in their presence concerning the homicide and the slaying of the deceased, and that while the juror had been informed that Draper and Mrs. Jensen were suspected of the slaying, he had no opinion as to their guilt or innocence; that he did not "exactly recollect what he stated" to the affiants on such occasions respecting the slaying, but "he did not say to either of them that the slaying of Andrew Bjerregaard was murder and that Mendon Draper was guilty of the murder, either in substance or effect; that he at no time between the 12th of April and the submission of the case to the jury for its decision, had any opinion as to the guilt or innocence of Mendon Draper," and at no time expressed any opinion on that subject to any person whomsoever; that in the course of affiant's employment he was asked many questions by divers persons at service stations at which he delivered

gasoline, of and concerning the slaying of Andrew Bjerre-gaard, and in answer to such questions he told his inquisi-tors such information as had reached him by way of public rumor, but made no statement of any opinion respecting the guilt or innocence of the defendant Mendon Draper, or Ivadell Jensen.

On subpoenas issued on behalf of the state the three af-fiants deposing on behalf of the defendant were summoned and examined by the district attorney and counsel for the defendant in open court. One of them testified that he had several conversations with the juror; that the first was on the 13th when the juror told him he did not know "whether it was murder, suicide or what it was; that they suspected Mendon Draper and Ivadell Jensen"; that three or four days thereafter the affiant had a further conversation with the juror when he made the statement "expressing his own opinion, in his own mind, that they (Draper and Mrs. Jen-sen) were responsible for it," the slaying of the deceased. The affiant further testified that he was unable to quote "the exact language used by the juror and would not under-take to state any particular or exact statement made" by the juror; that "he expressed the opinion that they were guilty of committing it, that is all."

"Q. You are sure of that, are you? A. Yes sir."

The affiant, however, was not sure whether the juror used the word "guilty" or not; that as nearly as he could recall the juror stated that Draper and Mrs. Jensen "com-mitted it, that they did it," but the affiant could not say whether the juror used the word "murder" or not; that the juror stated "the people thought it was murder, and it looked like murder all right."

Another of the affiants testified that he had understood from a good many sources that it was murder and that he asked the juror "if they had caught the murderers yet," and the juror answered, "Yes," and stated that "there is no question in my mind but that it was Draper and that

woman." When the witness was asked if the juror used the word "guilty," the witness answered that the juror stated that "they did it; that there was no question in his mind but what they did it." The witness, however, testified that he would not say that the juror used the word "guilty," yet several times answered that the juror stated "there was no question in his mind but what it was Draper and that woman" who committed the offense, and that there was not anything in the affiant's affidavit which he desired to change.

The other affiant testified he did not remember the exact day he talked with the juror, but that it was approximately on the 26th of April; that he could not recall what the words were as used by the juror; that the juror talked to him about the slaying of the deceased, but the witness was not able "to quote" what the juror told him, but from what he said the witness got the impression that the juror thought Draper and the woman were guilty. When his attention was called to his affidavit he stated, "I rather think that the affidavit puts it a little strong, because all I have at present is my recollection of getting the impression that" the juror "thought that those parties were guilty. What he said at that time to give me that impression I am not able to recall"; that the juror must have said something to give him that impression, but he did not remember just what it was. The witness further testified that he had not heard much of the case and desired to get the opinion of the juror and asked him about it, and that the juror gave him the impression that Draper and Mrs. Jensen were guilty, although he could not recall that the juror used the word "guilty." The juror was not called or examined concerning his affidavit.

In considering the matter and overruling the motion for a new trial, the court by a written opinion observed that the showing was insufficient to justify the conclusion that the juror had prejudged the case, or had expressed an opinion that the defendant "was guilty of murder," especially when the affidavits are considered in connection

with the oral examination of the affiants before the court; and that whatever statements were made by the juror in conversations with the affiants were based on "news or rumors" which the juror had heard, and expressed no "feeling or prejudice" against the defendant, as was the case in *State* v. *Morgan, alias Majors,* 23 Utah 212, 64 P. 356, where the overruling by the trial court of a motion for a new trial on the ground of disqualifications of jurors was reversed and a new trial granted. While the alleged statements of the juror in the case in hand are not as aggravated as were the statements of jurors in the Morgan Case, yet in that case the making of the statements by the jurors was not denied nor explained by them; and, too, there the state, instead of contradicting the alleged statements, resisted the motion for a new trial on the ground that the motion was not filed in time and that the court was without jurisdiction to entertain it.

In the case of *State* v. *Mickle,* 25 Utah 179, 70 P. 856, there were three affidavits filed on motion for a new trial showing statements made by a juror adverse to the defendant prior to the juror having been called in the box, and counter affidavits of the juror and affidavits of two other affiants denying the making of such statements by the juror. It was held that if the adverse statements were in fact made by the juror, he was disqualified, and that a new trial should have been granted. But because of the conflict in the evidence with respect thereto, the disqualification of the juror was not so clearly and satisfactorily shown as by the law required; hence no error was committed in overruling the motion for a new trial. But it further was there also held that the motion was properly overruled because it was not filed in time; that it was not sufficiently made to appear that the motion was filed within thirty days after the discovery of the alleged disqualification of the juror.

Further cases are cited by the State: *State of Nevada* v. *Marks,* 15 Nev. 33, *People* v. *Fair,* 43 Cal. 137, and *People* v. *Mortimer,* 46 Cal. 114. We think they are not in point,

for it was there held that under the statute or Practice Act in such jurisdictions a discovery after verdict of disqualification of a juror was not ground for a motion for a new trial. In this jurisdiction the rule is otherwise.

*State* v. *Smith,* 115 Wash. 405, 197 P. 770, also is cited. Five affidavits were there filed showing prior adverse statements made by one of the jurors. Counter affidavits were filed by the juror and a number of affidavits of other parties in denial of the statements. Some of such counter affidavits also tended to show interest and motive of the affiants filing the affidavits on behalf of the defendant. Neither the contents nor the substance of the affidavits are referred to in the opinion. The holding was that because of a conflict of evidence respecting the disqualification the matter was in the sound discretion of the trial court and the overruling of the motion for a new trial upheld. The case most strongly relied on by the state is that of *Hughes* v. *People,* 116 Ill. 330, 6 N. E. 55, 58. There affidavits were filed that three jurors had previously expressed opinions as to the guilt of the defendant. Each of the jurors by affidavit "positively denied the statements attributed to them." They were corroborated by affidavits of other persons. The court said:

"Considering all the affidavits together, it is not thought it is sufficiently proved either of the jurors whose competency is now called in question had previously formed any such opinions concerning the guilt of defendant as would disqualify them, or either of them. A verdict ought not to be set aside on such grounds, unless it is made to appear from satisfactory evidence the jurors had previously formed and expressed opinions hurtful to the defense."

In the case of *Egli* v. *Hutton,* 135 Or. 175, 294 P. 347, it is said that the granting of a new trial for misconduct of a juror is a matter for the trial court's sound discretion, and that its determination will not be disturbed except for abuse. In the case of *State* v. *Gonce,* 87 Mo. 627, the court stated that whether the juror had prejudged the case is a question of fact to be determined by the trial judge, just as any other

question of fact on sworn statements. Again it has been said that the test is as to whether the ruling of the trial court was against the decided weight of the evidence touching the disqualification of the juror. *Hoard and Kite* v. *State,* 15 Lea (83 Tenn.) 318; *State* v. *Wyatt,* 50 Mo. 309. Other courts have held that there was no abuse of discretion where the evidence respecting the disqualification of the juror was in conflict. *Martin & Sons* v. *Bank of Leesburg,* 137 Ga. 285, 73 S. E. 387; *Baker* v. *Commonwealth,* 192 Ky. 478, 233 S. W. 1046; *Judd* v. *State* (Ariz.) 16 P. (2d) 720. In *Henrie* v. *State,* 41 Tex. 573, it was held that where by affidavit it was shown, and not explained by the juror, that he had before the trial expressed an opinion adversely to the defendant, a new trial should have been granted. To that effect is also *State* v. *Morgan,* supra. The Kansas court in the case of *State* v. *Morrison,* 67 Kan. 144, 72 P. 554, by the syllabus, put the proposition that when affidavits charging jurors with having expressed opinions as to the guilt of the defendant prior to their being called as jurors are relied upon to annul a verdict and obtain a new trial, it must be clearly shown such expressions of opinion would, if known, have been sufficient to sustain a challenge for cause at the time the jury was impaneled. So, too, in 16 C. J. 1152, that anything which is good cause of challenge is good cause for a new trial, if not known to the party or his counsel before verdict.

In 9 Third Decennial Digest, Criminal Law, 1158(3), p. 1108, it is stated that the question presented as to qualifications of veniremen is one of mixed law and fact, and findings of trial court thereon will not be set aside, except for manifest error; citing cases from numerous jurisdictions. And lastly the Kansas court, in the case of *State* v. *Smith,* 74 Kan. 383, 85 P. 1020, 89 P. 21, said that in such case the ordinary rule applicable to the determination of facts by a jury or court in the trial of the contested issues of an action, that it will not disturb such finding if supported by some evidence, does not obtain.

Thus from the cases it may be stated as a general proposition that where there is a substantial conflict in the evidence respecting the disqualification of a juror, discovered subsequent to verdict, a ruling made thereon by the trial court will not be disturbed, unless against the manifest or decided weight of the evidence, or is palpably erroneous, or shown to have been made not in the exercise of a sound discretion.

By an "abuse of discretion," as stated by the Oklahoma court in the case of *Starr* v. *State,* 5 Okl. Cr. 440, 115 P. 356, 363, and approved in *Quinn* v. *State* (Okl. Cr. App.) 16 P. (2d) 591, "is meant a clearly erroneous conclusion and judgment—one that is clearly against the logic and effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing." To that effect is *Webber* v. *Webber,* 157 Minn. 422, 196 N. W. 646. It does not imply intentional wrong or bad faith or misconduct, nor any reflection on the judge. *Root* v. *Bingham,* 26 S. D. 118, 128 N. W. 132; *State* v. *Dist. Court,* 213 Iowa 822, 238 N. W. 290, 80 A. L. R. 339. It is a legal term to indicate that the appellate court is of the opinion that there was commission of error of law in the circumstances. *Bishop* v. *Bishop,* 164 S. C. 493, 162 S. E. 756. It is an improvident exercise of discretion; an error of law. *Quinn* v. *Gardner* (C. C. A.) 32 F. (2d) 772; *Bringhurst* v. *Harkins,* 2 W. W. Harr. (Del.) 324, 122 A. 783. A discretion exercised to an end and purpose not justified by and clearly against reason and evidence. 1 C. J. 372.

The defendant here had the burden of showing the disqualification by satisfactory evidence. Following the rule that the question presented is one of mixed law and fact, it may be conceded that if the juror made the statements and expressed the prior opinions attributed to him as shown by the affidavits filed on behalf of the defendant, and no explanation given of them, the juror as matter of law was disqualified, and that a new trial ought to have been

granted. *Busick* v. *State,* 19 Ohio 198; *State* v. *Morgan,* supra; *State* v. *Mickle,* supra. Whether such statements were made and opinions expressed was a question of fact. The trial court, from all made to appear, found that such statements were not made by the juror.

The affidavits filed on behalf of the defendant were modified by the oral examination of the affiants, at least as to one of them. The juror denied the statements attributed to him. While he admitted talking with the affiants who filed affidavits on behalf of the defendant, concerning the slaying of the deceased, giving them information and knowledge acquired by him through rumor and from what he heard others say, yet denied that he expressed any opinion concerning the guilt or innocence of the defendant. His testimony that what was stated by him to the affiants was based on rumor and on what he heard others say, is to some extent corroborated by the oral testimony of one of the affiants. That the juror had read about the case, heard it discussed and talked about on the street by others, the details of what had happened in the deceased's house related to him and was told that the deceased was killed and that the defendants were accused of the crime and had been arrested, all appeared by the examination of the juror on voir dire. The trial court in passing on the question of the disqualification of the juror no doubt took into consideration the statements and answers so made by the juror on voir dire, and from all made to appear respecting the claimed disqualification of the juror, reached the conclusion that whatever was stated by the juror to the affiants was in response to questions asked by them and was based on rumor and information acquired by him; that the juror expressed no opinion of his own, much less an unqualified or fixed opinion (Comp. Laws Utah 1917, § 8956), as to the guilt of the accused; and that whatever was related by him to the affiants did not prevent him from acting fairly and impartially as a juror, or from rendering a verdict based alone on the law and the evidence. Because of the conflict in the evidence

respecting the disqualification of the juror and of the nature and circumstances thereof, we are not prepared to say that in reaching such conclusion the trial court did so against the clear and manifest weight of the evidence, or in such particular abused his discretion. We would have been better satisfied if the district attorney had also brought the impugned juror or the trial court had required him to be brought before the court, as were the other affiants, and subjected to cross-examination on his affidavit and as a result thereof his affidavit had not been materially modified or weakened and the circumstances of the deposed facts more fully explained by him. *Nash* v. *State,* 2 Tex. App. 362. We thus are of the opinion that no error was committed in overruling the motion for a new trial.

The judgment is therefore affirmed.

ELIAS HANSEN, FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.