[No. 29864. *En Banc.* September 20, 1948.]

THE STATE OF WASHINGTON, *Respondent*, v. ARCHIE BROWN et al., *Appellants.*[1]

[1]Reported in 197 P. (2d) 590; 202 P. (2d) 461.

*Floyd A. Futter* and *George H. Freese* (*Florence Mayne*, of counsel), for appellants.

*Wm. J. Gaffney*, for respondent.

MALLERY, C. J.—Archie Brown, Aaron Johnson, and Willie Smith were jointly informed against for first-degree murder in one count and robbery in another. Defendants Brown and Johnson were convicted on both counts, and appeal.

At the beginning of the trial, and before the jury was impaneled, Willie Smith, being represented by counsel, changed his plea from not guilty to that of guilty on the first-degree murder count, and thereafter the robbery count was dismissed as to him.

The case which the state was prepared to offer, prior to the time Willie Smith changed his plea to the information

and testified on behalf of the state, was almost entirely based upon circumstantial evidence.

A couple of days before the commission of the crime, Aaron Johnson had driven Archie Brown, Willie Smith, and Helen Minor from Portland to Pasco in his maroon-colored Packard sedan. Aaron Johnson and Helen Minor found quarters at Dixon's Trailer Camp, a little way out of Pasco, and Willie Smith stayed at the Parkside Trailers.

On the evening of Friday, September 28, 1945, very soon after dark, a man by the name of Bert Franklin Williams, who had been drinking beer in the Apex tavern in Pasco and had reached that condition where the tavern operator would serve him no more liquor, got into the maroon Packard sedan of Aaron Johnson and, in company with Archie Brown and Willie Smith, was taken, as he thought, to secure some whisky. Aaron Johnson drove the car, at least after they left the city, and, after driving a short distance, he turned off onto a little used one-track road and proceeded about a quarter of a mile, where, after going down a dip which hid them from the main road, he turned his car around and started back for a distance of thirty feet, when he stopped. Thereupon, Archie Brown dragged Williams out of the car, striking him so that he became unconscious, from which blows he died at some time between then and the following morning, when he was discovered, without, in all probability, according to medical testimony, ever regaining consciousness.

Willie Smith rifled his clothing and took his money. He was tossed onto the side of the road, after which they pushed the car (because its battery was down) until it started, and the three defendants returned to Pasco.

On the way back, the money taken from the deceased was divided among the three of them. Somewhere around a couple of hours later, a man by the name of Rigas, who had been drinking in the same Apex tavern, had fallen into a conversation with one Dorothy Day. She induced him to enter Aaron Johnson's maroon Packard sedan, and she, with the same three defendants, drove out to approximately

the same spot where Williams had been killed, and there Rigas was taken out of the car, beaten, robbed, and left. The defendants and Dorothy Day returned to Pasco, dividing the money taken from Rigas among them on the way back.

Much of the record in this case is concerned with the identity of Williams, who was a stranger in Pasco. None of his relatives could be traced. His name was ascertained only by papers in his billfold, such as his social security card.

Some of the chief circumstances relied upon by the state were the marks of the four tires of the car that were made in turning around on the narrow road at the scene of the crime, which were photographed and compared with the tires on the defendant Johnson's car. A claim check on a check stand was found in the effects of Willie Smith and presented at the check stand. The parcel it covered was received. In the parcel was a comb having in or on it certain human hair, cloth fibers, and some squirrel hair. These were microscopically examined and compared with the hair of the deceased and certain cloth fibers of his clothing and certain hair in his pocket, by which comparison the state attempted to prove that the parcel, the claim check for which was taken from Willie Smith, had belonged to the deceased. Willie Smith's possession of the deceased's claim check was particularly important to the circumstantial evidence aspect of the state's case.

It was the position taken by Aaron Johnson that he was unaware of the purpose the other two had of committing a robbery until it was actually being done at the scene of the crime. He claimed to have been surprised. He denied receiving any share of the money, and, in the Rigas transaction occurring a couple of hours later, it was his position that he had expected to receive two dollars from Dorothy Day in return for taking Rigas and Dorothy Day to her residence for their mutual purpose, but that he had not received the two dollars and was not aware that a robbery was contemplated until it was being consummated. In the robbery case, Dorothy Day had pleaded guilty, and Aaron

Johnson had been dismissed. A finding of lack of intent might well have been the basis upon which his dismissal rested.

It is apparent that there is no possible explanation available as a defense for Archie Brown and Willie Smith, who struck and robbed the deceased, but, as to Aaron Johnson, whose activity in the crime consisted of furnishing the car and driving it to the scene of the crime, but who did not lay hands on the deceased, the question of intent becomes the crux of the matter.

It is true that Willie Smith did give direct testimony upon the purpose of taking the deceased out in the car. This, however, the jury were privileged to disbelieve if they had elected to do so.

Evidence of the Rigas robbery was introduced by the state to show plan, intent, and design.

Objections were made to the admission of the testimony in regard to the Rigas robbery on the ground that it showed the commission of a distinct crime and constituted prejudicial error.

It is appellants' contention in assignment of error No. 13 that the second robbery was no part of the *res gestae* of the first offense; that they were separate and distinct offenses; and that the evidence regarding a subsequent crime was presented for no other purpose than to prejudice the jury, and was violative of appellants' Federal and state constitutional rights.

The evidence presents a clear-cut picture of a plan or a scheme employed, which, to that extent, forms a part of the *res gestae,* marking and identifying the actors, the acts, the means, the place, the time, the objectives, and the results. See 4 Nichols Applied Evidence 3425, § 3.

The rule is that other crimes cannot be shown to establish the crime charged, excepting where they are closely connected with the crime charged and furnish evidence material to that crime. *State v. McDonald,* 116 Wash. 668, 200 Pac. 326; *State v. Kaukos,* 109 Wash. 20, 186 Pac. 269; *State v. Sigler,* 116 Wash. 581, 200 Pac. 323.

The general rule is succinctly stated in *State v. Anderson,* 10 Wn. (2d) 167, 116 P. (2d) 346, as follows:

"The general rule is, of course, that evidence of other crimes may not be introduced to establish the crime charged."

However, there are well-recognized exceptions to this general rule which likewise are found emphasized in *State v. Anderson, supra,* in this language:

"There are, however, several well-recognized exceptions to the rule. One such is where the crime charged is so connected and related to another crime as to give evidence of the latter probative value in proving the former." (Citing cases.)

The application of the exception to the rule has been stated as follows:

"Evidence of other crimes may be admitted when it tends to establish a common scheme or plan embracing the commission of a series of crimes so related to each other that proof of one tends to prove the other, and to show the defendant's guilt of the crime charged. *Subsequent* as well as prior collateral offenses can be put in evidence, and from such system, identity or *intent* can often be shown. . . . The time of the collateral facts is immaterial, provided they are close enough together to indicate that they are a part of the system." (Italics ours.) 1 Wharton's Criminal Evidence (11th ed.) 527, § 352.

The following statement is made in 4 Nichols Applied Evidence 3424, § 2:

"Evidence tending to show the commission of another crime is admissible in a proper case, but the exceptions to the general rule 'are carefully limited and guarded by the courts, and their number should not be increased.' Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish: . . . (2) intent; . . . (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other."

In *State v. Davis,* 6 Wn. (2d) 696, 108 P. (2d) 641, a case of murder in the first degree, this court said:

"In making its case, the state was entitled to introduce any evidence which was competent, relevant, and material to the issue to be determined by the jury. That a portion of the evidence so offered might incidentally tend to show that appellant had been guilty of some other and separate offense, is unimportant if the evidence tended to support the state's contention in the case being tried, and was admissible under the general rules of evidence."

The court, in that case, quoted with approval from *State v. Gottfreedson*, 24 Wash. 398, 64 Pac. 523:

"The general rule is well established that proof of the commission of a separate and distinct crime will not be admitted for the purpose of aiding the conviction of defendant for the crime charged. There are exceptions, however, to this general rule, as where the testimony shows a connection between the transaction under investigation and some other transaction, and where they are so interwoven that the omission of the testimony in relation to the other crime would detract something from the testimony which the state would have a right to introduce as tending to show the commission of the crime charged by the defendant, or where it is apparent that the parties had a common purpose in the transaction of both crimes, or where the testimony tending to show the commission of one crime tends to prove a condition of mind which must necessarily be entertained by the defendant in the commission of the crime charged."

■ The commission of the Rigas offense was but a repetition of the Williams crime, committed by the same parties, employing the same means, operating in the same vicinity, on the same day within a couple of hours' time of it, to secure the same results, each step of which, when compared with the Williams murder, showed a single unified design and purposive scheme. The jury was entitled to take these facts into consideration, together with all of the other facts in the case, in determining the guilt or the innocence of the appellants. The Rigas robbery served circumstantially to disclose the *modus operandi* and the appellants' intent in the crime charged. See 6 Wigmore on Evidence (3d ed.) 240, § 1791. The admission of the evidence concerning the Rigas robbery falls under the exception to the rule and therefore was not error.

The first assignment of error is that the court did not grant a motion for a change of venue made on the ground of racial prejudice. All of the affidavits in support of the motion, but one, asserted a prejudice against the colored race generally, rather than against the particular appellants, who were strangers in the community. The appellant Archie Brown made his affidavit in support of the motion for a change of venue upon the ground that the newspaper publicity had inflamed public opinion.

Rem. Rev. Stat., § 2018 [P.P.C. § 141-15], provides as follows:

"The defendant may show to the court, by affidavit, that he believes he cannot receive a fair trial in the county where the action is pending, owing to the prejudice of the judge, or to excitement or prejudice against the defendant in the county, or some part thereof, and may thereupon demand to be tried in another county. The application shall not be granted on the ground of excitement or prejudice other than prejudice of the judge, unless the affidavit of the defendant be supported by other evidence; nor in any case unless the judge is satified the ground upon which the application is made does exist."

█ The statute does not contemplate such prejudice as a ground for a change of venue. There was no showing made of individual prejudice against any of the appellants such as is contemplated by the statute. The newspaper articles were factual in nature rather than inflammatory and such as are universally encountered in that type of news.

A motion for a change of venue is directed to the sound discretion of the court. It was not abused in this case. See *State v. Straub*, 16 Wash. 111, 47 Pac. 227; *State v. Champoux*, 33 Wash. 339, 74 Pac. 557; *State v. Welty*, 65 Wash. 244, 118 Pac. 9; *State v. Smith*, 115 Wash. 405, 197 Pac. 770; *State v. Lindberg*, 125 Wash. 51, 215 Pac. 41; *State v. Adams*, 144 Wash. 363, 258 Pac. 23; *State v. Whidden*, 144 Wash. 511, 258 Pac. 318; *State v. Schafer*, 156 Wash. 240, 286 Pac. 833; *State v. Schneider*, 158 Wash. 504, 291 Pac. 1093, 72 A. L. R. 571; *State. v. Comer*, 176 Wash. 257, 28 P. (2d) 1027; *State v. Guthrie*, 185 Wash. 464, 56 P. (2d) 160.

The second assignment of error is:

"The trial court erred in allowing in evidence to impeach and incriminate the appellant Aaron Johnson statements elicited from him by continuous and threatening questioning for a period of eleven days before his request to see counsel was granted."

The examination in question was that of the state in cross-examination of the appellant Johnson, in which the state impeached his testimony by cross-examination as to his contrary voluntary statements made before the trial. Touching this assignment, the statement of facts shows the following questions and answers:

"MR. HORRIGAN: The Court asked the witness if any threats were made to the witness immediately before the statement was given, or while it was given, in the presence of myself, Florence Green, and the sheriff. THE COURT: Were they at that time, or not? A. No, I wouldn't say any threats were made. THE COURT: Do you say there were, or not? A. No."

The appellant's previous statements have not been made to appear as made under threats or duress so as to be inadmissible for impeachment purposes. Appellant's citations upon the question of extorted confessions are therefore not in point.

If the appellant Johnson was denied an opportunity to consult counsel for eleven days (and the record is far from conclusive as to that), it is not to the credit of the state and not to be commended. But, assuming it to be true, that happened previous to the trial, at which he was well represented. It happened likewise before any possible future new trial asked upon that ground. To allow it as a ground for a new trial, would make it impossible ever to bring the appellant to the bar of justice. Such a ruling would be tantamount to granting him permanent immunity. We find no merit in the second assignment of error.

Appellants' third assignment of error is: "The trial court erred in repeatedly exhibiting prejudice against the appellants in the presence of the jury."

The matters urged in support of this assignment run mostly to rulings of the court made during the trial. It

is a catch-all assignment referring to other assignments. We quote from appellants' brief on this assignment:

"Appellants can find very few instances in the record where their objections were sustained. They were almost continuously overruled although made conscientiously and in accordance with the rules of evidence as counsel understood them."

We find no support for this assignment in the record.

Assignment No. 4 is: "The court erred in questioning the witnesses and directing the trial in a manner to assist the prosecution."

The appellants assert under this assignment of error that the following things were said or done: that Richard C. Rector had testified without being sworn; that he was recalled by the court, and the court attempted to cure the error by questioning the witness himself, summarizing his testimony in a few words, and readmitting his identifications in evidence over objections of counsel for appellants; that the court questioned the witness Haylett as to the facts showing venue; that the court asked a pertinent question which the prosecution had omitted in attempting to qualify a witness as an expert as follows: "Is it inherent in the business of a mortician to know periods that a corpse has been dead?"; that the court assisted the prosecution with the identification of the car driven to the death scene over the objections of defense counsel Beardsley; that the court asked the questions of the recalled prosecution witness Harter, to which appellants excepted; that counsel for appellant Johnson objected to an interruption of a witness by the court by prompting the witness in calling attention to statements he had made, as being improper conduct on the part of the court.

Appellants rely on *State v. Crotts*, 22 Wash. 245, 60 Pac. 403, and *State v. De Pasquale*, 39 Wash. 260, 81 Pac. 689, in which questioning of witnesses by the trial court in a manner unfavorable to the defense resulted in reversals by this court.

486

We quote from *State v. De Pasquale, supra:*

"There can be no doubt that the court, by such questions as the following: 'You went out there with a pistol expecting to meet him and have a shooting scrape with him?' 'Did you say anything to him about going to shoot?' 'If you had stayed inside, wouldn't you have been safe?' 'When he went outside, if you had stayed inside, wouldn't you have been safe?'—clearly conveyed the idea to the jury that the appellant was at least guilty of manslaughter, and that the plea of self-defense was not *bona fide,* in the opinion of the court."

The *De Pasquale* case is an example of questioning by the court which amounted to a comment on the evidence in contravention of Art. IV, § 16, of the constitution of the state of Washington, which reads as follows:

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

██ But not all questioning by the court reveals an opinion of the court. As was said in *Dennis v. McArthur,* 23 Wn. (2d) 33, 158 P. (2d) 644:

"That the court has wide discretionary powers in the trial of a cause and is not prohibited from questioning a witness, is beyond controversy. Such a course may constitute a comment on the evidence where it is improperly done. To constitute a comment on the evidence, however, it must appear that the attitude of the court toward the merits of the cause must be reasonably inferable from the nature or manner of the questions asked and things said."

We find no instance in the record where the opinion of the court as to the merits of the case could be inferred from any question asked. The questioning by the court was not error.

██ As to the Richard C. Rector incident, so far as we can determine from the record, the omission to swear him before he first gave testimony was an inadvertence. No objection was made to it. His testimony was limited to the matter of his preparation of certain maps of the scene of the crime later offered in evidence and his qualifications to make them. Then the following occurred:

"THE COURT: Call Mr. Rector again. The court did not swear him as a witness. Richard C. Rector was thereupon sworn to testify the truth, the whole truth and nothing but the truth, and testified as follows: BY THE COURT: Q. Do you now, Mr. Rector, repeat all the testimony that you gave in the first instance as to your qualifications, and as to your drawing these maps? A. Yes, sir. Q. Was your testimony all true that you gave? A. Yes, your Honor. Q. And you now repeat it? A. Yes, sir. Q. Treat it as repeated, rather? A. Yes, sir."

No objection or motion of any kind was made as to this by appellants. There is now nothing in the record that is not sworn to.

The inadvertence was cured without objection and does not constitute reversible error.

The fifth assignment of error is: "The court erred in repeating, emphasizing and commenting upon the evidence."

We quote the gist of appellants' contention: "Also, this clarified the testimony, which was the duty of the prosecution, not the court."

 Without setting out the things said by the court, to which generally no objections were made, it may be said that they consisted in giving reasons for his rulings, which is permissible (see *State v. Surry*, 23 Wash. 655, 63 Pac. 557; *State v. Brown*, 19 Wn. (2d) 195, 142 P. (2d) 257), or in asking clarifying questions, which is also within the sound discretion of the court.

Appellants' sixth assignment of error is: "The court erred in allowing the jury to examine identifications not yet introduced in evidence." The record shows they were subsequently admitted, thereby curing any possible error.

Appellants' seventh assignment of error is: "The court erred in allowing in evidence as exhibits articles not properly identified." This assignment is without merit. The record discloses an adequate identification.

Appellants' eighth assignment of error is: "The court erred in allowing the jury to examine a car and tires not introduced in evidence." This assignment will be disposed of under the ruling on assignment No. 12.

■ Appellants' ninth assignment of error is: "The court erred in allowing witnesses to identify exhibits and testify without being sworn."

Mr. McCall was brought into the courtroom while another witness was on the stand, for the purpose of watching while certain packages containing exhibits were opened. Counsel for the defense consented to this. The court said: "You have seen them before, have you?" Mr. McCall said: "Yes, sir. . . . This is K-3, K-4, K-5," etc. Later he took the witness stand and under oath testified about each of the exhibits, thereby curing any previous defect. This assignment of error is without merit.

■ The appellants' tenth assignment of error is: "The court erred in disregarding the rule of exclusion of witnesses."

Appellants complain that the court ignored the exclusion rule in allowing Deputy Sheriff Harvey Huston, the only prisoners' guard available at the time, to testify.

The record reveals that Mr. Huston was called to testify to the identity of the baggage check which had previously been testified to by another witness, Mr. Harter, while Mr. Huston was outside of the courtroom. Under those circumstances, Mr. Huston was allowed to testify, being limited to the identification of the baggage check. The matter of exclusion of witnesses during a trial is within the discretion of the trial judge. *State v. Colotis,* 151 Wash. 557, 276 Pac. 857; *Castleman v. Schiffner,* 160 Wash. 313, 294 Pac. 983. The ruling of the trial judge in permitting the officer to testify was not error.

Appellants' eleventh assignment of error is: "The court erred in allowing opinion evidence from two persons not qualified as expert witnesses."

These witnesses were C. Erwin Piper, a special agent of the F.B.I., and Donald F. McCall, an instructor at Washington State College. The record shows them to be amply qualified experts as to the matters about which they testified. The trial court did not abuse its discretion in so holding.

The appellants' twelfth assignment of error is: "The court erred in conducting part of the trial out of the court room and out of the presence of the appellants."

The latter part of this assignment is not borne out by the record. The appellants were present with their counsel and the entire trial court at all times. The court did adjourn to the courtyard, where appellant Johnson's maroon Packard sedan had been brought under direction of the court. There, in the presence of all, certain examination of witnesses was made in view of the car. Appellants make three points under this assignment of error: (1) that the court had no authority to adjourn to the courtyard and hear testimony there; (2) that the jury considered personal property not offered or received as exhibits, and (3) that the jury and the defendants became separated.

As to the first point, it was said in *State v. Lee Doon*, 7 Wash. 308, 34 Pac. 1103:

"The trial can be but in one place at a time, and that place is where the judge presides and the evidence is produced."

We think a properly constituted court, where all proper and necessary persons are in attendance, may be conducted at such places as convenience dictates. Nor do we think the place need be any particular structure, building, or room. The court, as such, is where the judge presides, and, within reason, the court has discretion in determining the place. In this instance, the automobile could not be brought into the courtroom. As a matter of convenience, the court in its entirety adjourned to the courtyard, where the car was. We find no error in this.

In passing, it may be noted that this situation is not within the purview of Rem. Rev. Stat., § 344 [P.P.C. § 99-43], which provides for the viewing of premises by the jury, at which time no one may speak to them other than the judge. The citations touching Rem. Rev. Stat., § 344, are not in point.

As to the second point, it is true that the car was not and could not be admitted as an exhibit. Photographs were admitted, and the fairness of their representations is not questioned. Competent evidence with regard to an object is

not inadmissible or subject to be stricken solely on the ground that the object itself is not admitted in evidence.

As to the third point, the record does not bear out the assertion that the jury and the appellants became separated.

We find no error under assignment No. 12.

Appellants' thirteenth assignment of error was directed to the admission of evidence of a subsequent crime which has been heretofore treated in this opinion.

Appellants' fourteenth assignment of error is: "The court erred in helping the prosecution frame questions which were leading and put words in a witness' mouth."

During the absence of the jury, the prosecutor and the court went into the matter of what questions could be asked of a certain witness. The court indicated what questions he would permit, and, after the jury was recalled, these questions were asked and answered. The objections to the questions asked in the presence of the jury have been treated under assignment No. 13. We find no error in this occurrence.

Appellants' assignment No. 15 is: "The court erred in not granting a new trial to the appellants for the errors cited above."

Not having found any error in the assignments, the judgment is affirmed.

STEINERT, JEFFERS, and SCHWELLENBACH, JJ., concur.

HILL, J. (concurring in the result)—I agree with the majority on all except one of the issues raised, and as to that my disagreement makes no difference in the ultimate result.

The majority refers to the evidence of the Rigas robbery as having been admitted to show plan and intent, and I agree that it was admissible for that purpose. However, as I read the record, at the conclusion of the state's case in chief, the testimony had established that the same parties who had been present at the murder and robbery of Williams, with the addition of Dorothy Day, and under similar circumstances, had taken one Rigas to almost the same place, and

Brown and Smith had beaten him and left him there. There was no testimony relative to a robbery, and technically it was the evidence of an assault on Rigas rather than the robbery of Rigas that was admitted to show the plan and intent. This distinction is immaterial, because the applicable rules governing the admission of evidence of a subsequent offense would be the same whether it involved an assault or a robbery.

It does, however, have some bearing on the subsequent course of the trial. Appellant Johnson was the only one of those charged with this crime who presented a defense. He testified, on direct examination, that Williams was pulled out of the car and beaten and robbed, Smith and Brown being the active participants in the beating and robbery. His testimony was that he had permitted the use of his car—he was driving at the time of the murder—for the purpose of taking Williams to a sporting house, and that he had no knowledge that any beating or robbery was proposed by Smith and Brown and did not share in the proceeds of it. On cross-examination, he was asked concerning his purpose in driving Rigas, Smith, Brown, and Dorothy Day to a place very near where Williams had been murdered, which was an entirely proper avenue of cross-examination. His explanation was that he was merely driving Rigas and Dorothy Day to a place where they could have sexual intercourse in his car, for which Dorothy was to receive ten dollars and he was to have two dollars (Smith and Brown apparently were along just for the ride). He did not testify as to the assault or robbery of Rigas, but he did say that he did not get the two dollars, using these words:

"Which she was to give me $2 for taking her out there, for using the car, and after he got out there, who taken the man's money I do not know. I asked her about the $2 and she claimed Willie Smith taken the man's money, and she said that Willie Smith claims she took it, so I don't know. Neither one of them give me any of the money."

In rebuttal, Dorothy Day testified that Johnson received ten dollars from the proceeds of the Rigas robbery and that the rest was divided between Smith, Brown, and herself.

This was admissible to show Johnson's intent and his knowledge of the use to which his car was being put. It is, however, as to this testimony that I believe there was an erroneous ruling by the trial court. Counsel for appellant Brown requested that the jury be instructed that this rebuttal testimony of Dorothy Day was not to be considered against his client. That request should have been granted. Brown had interposed no defense, and there could be no reason for any rebuttal testimony so far as he was concerned, and it should have been limited in its application to appellant Johnson. This point was argued at some length before this court, but I find no assignment of error covering it in the brief of appellants.

I am convinced, however, that the court's refusal to grant that request was not prejudicial to Archie Brown. Dorothy Day's testimony in the state's case in chief had already implicated Brown in an assault on Rigas. Appellant Johnson's testimony on cross-examination had added that somebody had taken Rigas' money. Dorothy Day's testimony on rebuttal spelled out the fact of the robbery, of which there was already, to say the least, a strong inference, and the only thing that it added to the picture then before the jury was the fact of Johnson and Brown's participation in the proceeds thereof. While Brown should have been spared the cumulative effect of her testimony, it certainly could have had no material part in the conclusions reached by the jury. The noose had already been placed around Brown's neck by the uncontradicted testimony of both Smith and Johnson as to his attack on Williams.

In the presentation of this appeal, there is no contention that there was not ample evidence to sustain the verdict of guilty against both appellants; but the argument most strongly urged upon us is that, if there had been no evidence of the Rigas assault and robbery, the appellants might not have received the death penalty. That evidence was admissible for the reasons given in the majority opinion, and, if the death penalty should ever be invoked, the evidence in this case clearly warranted it.

MILLARD, J. (dissenting)—This is a case where the interests of criminal justice collide with the rule that, upon the trial of a criminal case, evidence of the commission of other independent crimes by the defendant is inadmissible to show either guilt or that the defendant would be likely to commit the crime with which he is charged.

I do not recede from the position announced in my dissenting opinion in *State v. Brown*, 26 Wn. (2d) 857, 176 P. (2d) 293, that the rules of this court should not be breached or rewritten to except a particular individual from their operation or excuse his violation in a particular instance. On the record before us in that case, we could not, if we conformed to our rules, consider the statement of facts; hence, the presumption was conclusive that appellants had a fair trial. This court, in a majority opinion, permitted reinstatement of the appeals; hence, the entire record is before us, and a reading of it convinces me that appellants did not have a fair trial.

The rule is so well recognized that citation of sustaining authority is unnecessary, that it is reversible error to receive evidence, as in the case at bar, that accused committed a subsequent, independent crime. The two offenses were not connected and did not tend to prove motive for the crime of murder with which they were charged. The only effect of the evidence was to prejudice the accused and influence the jury to recommend the death penalty. That the crime is a heinous one is conceded. If the fact that we may be convinced of the guilt of appellants of that crime warrants our disregard of a just rule, which operates in favor of these two colored men, then the fact that the crime was an atrocious one and that the guilt of the accused was clear, would justify lynching by a mob. To such a rule, I cannot subscribe.

Evidence of a collateral offense must never be received as substantive evidence of the offense on trial.

"This rule extends to the proof of the accusation of another crime, as well as to evidence of its actual commission. Certainly, evidence to show that the accused committed an offense which was in no way connected with the crime charged is not admissible. . . .

"A man cannot be convicted of crime because he is a bad man generally or has committed other crimes for which he has not been punished. Evidence of other crimes, when offered in chief, violates both the rule of policy which forbids the state initially to attack the character of the accused and the rule of policy that bad character may not be proved by particular acts." 1 Wharton, Criminal Evidence (11th ed.), 483-487.

The exceptions to the rule that evidence of a collateral crime is inadmissible to show either guilt or that the defendant would be likely to commit the crime for which he is on trial, are motive, intent, identity, a common scheme or plan, and absence of accident or mistake. None of the foregoing exceptions could properly be claimed by the state in the case at bar to justify the admission of the evidence of the collateral crime. There was not a causal relation or natural connection between that crime and the one for which the appellants were being tried. Whether the subsequent crime was committed one hour, one day, one week, or six months subsequent to the commission of the crime for which appellants were tried, may not be considered. Time is not an element and does not bring the subsequent offense within the exception to the rule that evidence of a collateral crime is inadmissible.

This cause was heard on the merits by Department one, June 9, 1947, and the author of this opinion objected to the opinion affirming the judgment. The cause was heard *En Banc,* eight judges sitting, March 10, 1948. As the vote was four for affirmance and four for reversal, the cause was noted for hearing *En Banc,* May 6, 1948. Inasmuch as only eight judges could be present at that time, the cause was heard *En Banc,* June 14, 1948, at which time only eight judges were present. The cause was submitted to the absent judge on former argument heard by him.

The statute (Rem. Rev. Stat., § 11 [P.P.C. § 110-11]), provides that a concurrence of five judges *present* at the argument shall be necessary to pronounce a decision in the court *En Banc.* I challenge the validity of that statute. Whether the argument is a written one submitted to the

court, or whether the argument may be an oral one, is a matter within the discretion of the court. The legislature did not, by Laws of 1925, Ex. Ses., chapter 118, p. 187, Rem. Rev. Stat., § 13-1 [P.P.C. § 110-53], which purports to authorize the supreme court to make rules, grant to the court any power in excess of that which was inherent in the court.

Another question is suggested: When this court, by rule, shortens the time in which an appeal may be taken from a judgment, may the legislature subsequently enact a valid statute increasing the time in which an appeal may be taken from a final judgment?

Appellants are entitled to a new trial.

SIMPSON, J., concurs with MILLARD, J.

BEALS, J. (dissenting)—It seems to me clear that prejudicial error was committed by the superior court in the course of the cross-examination of the appellant Aaron Johnson, and on other occasions.

The majority opinion refers to the Rigas expedition and appellant Aaron Johnson's connection therewith, and states that "Evidence of the Rigas robbery was introduced by the state to show plan, intent, and design."

Assuming that evidence concerning the assault upon and robbery of Rigas, under different circumstances, might have been admissible, I am convinced that error was committed by the trial court in connection with that phase of the case at bar.

It appears that, after the jury had been impaneled and sworn, counsel for the state suggested that certain questions of law, which would probably arise, might well be discussed in the absence of the jury, whereupon the jury, pursuant to direction by the court, retired.

The prosecution then, at the court's suggestion, made a statement concerning certain evidence which the state desired to offer, whereupon the court directed the witnesses present to retire from the courtroom.

Counsel for the prosecution then stated that evidence would be offered to the effect that the appellants in this action, and defendant Willie Smith, on occasions other than

the robbery and murder of Williams, participated in crimes, in connection with which they had taken men in appellant Johnson's car for the purpose of robbing them. This statement is pertinent here only to the beating and robbing of Rigas, which occurred within two or three hours after the murder of Williams. In the case at bar, such evidence might be admissible only as tending to show a plan or scheme entered into and carried out by the appellants for the commission of crimes by way of robberies and incidental assaults.

Probably the majority of cases, in which it has been held that a plan or a scheme to commit crimes might be shown in the trial of a defendant for a particular crime, were cases in which the offense committed was forgery or some other fraudulent act. There are cases, however, in which it was held that such a plan could be shown in connection with crimes of violence.

After a lengthy statement by the prosecution, and argument by counsel, both for the state and for appellants (the arguments not being included in the statement of facts), the court delivered an oral opinion upon the questions presented by the prosecution, stating that the court was of the view that the evidence would not be admissible, although circumstances might arise during the trial which would result in a different conclusion.

During the statement by the prosecution, the court's attention was called to the fact that, soon after the murder of Williams, the appellants in the case at bar, together with defendant Smith and one Dorothy Day, had taken one Rigas, in Johnson's car, to a spot near that where Williams had been murdered, and that Rigas had been left there, after having been beaten and robbed.

The prosecution also referred to the fact that appellants here, and defendant Smith and Dorothy Day, had been tried, the week before the case at bar was called, for the offenses committed upon Rigas, and that the trial court had "dismissed the case against Aaron Johnson, stating we failed to prove a conspiracy."

The court, then, at this time was definitely advised that appellant Johnson had been tried for the Rigas assault and robbery and had been acquitted.

It may be noted here that the judge who presided at the trial of the case at bar did not preside at the trial based upon offenses against Rigas.

During the statement by the prosecution, counsel for the appellants in this action announced that they would object to the evidence to which the prosecution referred, when offered.

After stating its conclusion, as above set forth, the court recalled the jury, and the trial proceeded. Following the opening statement by the prosecution, appellants' respective counsel stated that they would reserve their statements. At the close of the state's case, counsel for appellant Brown made no opening statement, and counsel for appellant Johnson made a short statement in behalf of his client.

Dorothy Day was called as a witness by the prosecution, and, after some preliminary questions, testified that, at a time soon after the Williams murder, she, with appellants Brown and Johnson, defendant Willie Smith, and Rigas, entered Johnson's car and proceeded to a place which, other evidence indicated, was near the site of the Williams murder. Counsel for the prosecution then said that, in his opinion, the next question which he proposed to ask the witness should be stated in the absence of the jury, so that the court might rule thereon.

The court instructed the jury to retire, and, after some discussion, counsel for the prosecution stated that the question he proposed to ask was: " 'Tell what happened after you stopped the car. The car was stopped at this scene you pointed to?' "

Counsel for the state and for appellants then presented their arguments upon the propriety of the question, counsel for appellants contending that the question was objectionable.

The court then addressed the witness, saying: "If you are asked that question, what will your answer be," to which the witness replied:

"When the car was stopped, Archie Brown got out of the car and pulled Rigas out, and Willie Smith got out and they started beating him, and he asked them not to beat him, and I got out and tried to stop them and one of them pushed me."

Dorothy Day next stated that the group returned to town "and left Rigas out there."

Counsel for appellant Johnson then made the following objection:

"It is objected to on the part of the defendant Johnson for the reason it proves the commission of another crime separate and apart and independent of the crime charged in the Information, and for the same reasons as stated in my objections and argument at the time counsel presented the matter as to his opening statement at the very beginning of the trial,"

to which counsel for the prosecution answered:

"If your Honor please, if counsel for Aaron Johnson considers that a crime, that was not the case in the former trial when counsel urged that was not proof of a crime and the result of that was a dismissal."

Counsel for appellant Johnson was evidently referring to the arguments which he had presented at the beginning of the trial, in the absence of the jury, which arguments are not included in the statement of facts.

It should also be noted that, at this point, counsel for the prosecution again stated to the court that, in the trial of appellants and others for offenses against Rigas, that case, as against appellant Johnson, had been dismissed, resulting in his acquittal.

Counsel for appellant Brown then said:

"On behalf of the defendant Archie Brown, I would like to object to the answer for the reason it would prove the commission of another crime on his part, the crime of assault, and therefore, not admissible."

After further discussion, the court stated that the witness would be allowed to answer the question, and, when the jury returned, the court directed the reporter to read the question to the witness, and instructed the witness to answer the question, which she did as follows:

"When the car stopped Archie Brown got out of the back and pulled Rigas out the front, and Willie Smith got out and helped and they started beating him, and I got out and tried to stop them from beating him, and they shoved me, and they all got back in the car and went back to the Apex Tavern."

Counsel for the respective appellants presented their objections, which were overruled.

When the state rested its case, counsel for appellant Johnson made a brief statement concerning the robbery and murder of Williams, and conversations between Brown and Smith, on the one hand, and Johnson, on the other, while the parties were at the scene of the Williams robbery. Appellant Johnson was then called as a witness on his own behalf and was interrogated by his counsel as to his previous life history and certain preliminaries in connection with the taking of Williams in Johnson's car, followed by an account of the robbery and attack upon Williams, and the return of the party, in the car, to town. Counsel for appellant Brown briefly cross-examined Johnson concerning the Williams robbery, and counsel for the prosecution then cross-examined him at considerable length.

Up to this point, Johnson had been asked no question whatever concerning the Rigas robbery, nor had that event been referred to in any way. The first mention of Rigas, in Johnson's cross-examination, occurred as follows: Counsel for the prosecution had been propounding questions to the witness concerning other white men who had ridden with the witness in his car, and then asked:

"Q. How did it come about that they rode in your car and you didn't know their names? A. That has already been explained. Q. Not to me. I want you to explain it. A. I just got through explaining to you how he comes by, leading this other fellow, Rigas—Williams, I mean. Q. Which one? A. Williams."

The foregoing inadvertent mention of Rigas by the witness, followed by his immediate correction, affords no lawful basis for what occurred thereafter. The prosecution immediately asked: "What about Rigas? I thought you said

you didn't know him." This question was unwarranted, as the name Rigas had not been previously mentioned, save as above set forth. The witness answered: "I said I didn't know his name personally, didn't know the man personally." The witness continued to answer questions concerning Williams, when the following occurred:

"Q. Where were you when you met Rigas? A. Where were I when I met who? Q. Rigas. A. When I met Williams, I had walked in the Tavern, that is when I met Williams; and Rigas, when I met him, he was with Dorothy Day. He and Dorothy Day came up to my car. You already heard your own witness testify to that."

Further questions were propounded concerning Williams, and then the prosecution again asked the witness concerning Rigas, the witness answering that Dorothy Day had introduced Rigas to him. To the question, "What became of Rigas," counsel for appellant Johnson objected as being immaterial, his objection having been overruled. Further objections were interposed to questions concerning the Rigas robbery, upon the ground that the questions were immaterial and improper cross-examination. On one occasion, the court overruled the objections, saying:

"It is overruled, because it is part of the testimony in chief and because of the story this witness gave on what happened about the locked gate, and all that. It is admissible, and the objection is overruled."

Later, counsel for appellant Johnson stated: "I think the Court understands that all this is objected to on our part," to which the court replied: "The record shows you have objected to all of it." The following then occurred:

Counsel for appellant Johnson: "I think counsel is persistently trying to bring this element into the case, contrary to the Court's ruling. THE COURT: The Court hasn't ruled contrary to the questions that the Prosecutor has asked, and the witness may answer."

Finally, the court stated: "In view of the testimony of the witness on direct examination about the Rigas matter, the witness will answer the question."

In making this statement, the court was mistaken, as, on the direct examination of appellant Johnson, the name Rigas had never been mentioned, nor had reference been made to the robbery of Rigas. Thereafter, upon objection by counsel for Johnson, the court replied: "The Court has repeatedly overruled your objections," to which counsel preserved an exception.

After the lengthy cross-examination of appellant Johnson, no other witness for either appellant was called, and the prosecution recalled Dorothy Day, who again testified concerning the Rigas robbery. At the beginning of her direct examination, counsel for appellant Johnson stated:

"Objected to as improper rebuttal, having been covered by this witness's testimony in chief, and has not been denied by any testimony submitted by defendant Johnson,"

whereupon, counsel for the state said:

"If your Honor please, at the time we put in our case in chief, the Court ruled this matter could not be gone into, and it has been opened up by the defendant."

The court ruled: "In view of the testimony by Mr. Johnson, the Court will overrule the objection," to which counsel for appellant Johnson preserved an exception.

As stated above, the court was, on several occasions, informed that Johnson had been acquitted upon his trial for the Rigas robbery. It also appears from the record that Dorothy Day had been convicted upon that trial, upon her plea of guilty.

It does not appear that the jury was ever advised that that trial had resulted in the acquittal of appellant Johnson. The jury was not instructed that he had been acquitted upon his trial for that offense and that, consequently, they should not consider any evidence which was introduced concerning that trial as indicating that Johnson had been guilty of any crime in connection therewith. It is true that it does not appear that counsel for appellant Johnson requested any such instruction, but, nevertheless, it was the duty of the court, upon the record as made, to give the jury an appropriate instruction to that effect.

By Art. IV, § 16, of the constitution of Washington, it is made the duty of a trial judge, in instructing a jury, to "declare the law." The basic responsibility rests upon the court to instruct the jury as to the law, in so far as the jury's findings or verdict is controlled thereby. The court must adequately and properly instruct the jury concerning the law which they must follow, regardless of whether or not counsel for the respective parties to the action submit proposed instructions for the court's consideration.

In the case at bar, the fact that appellant Johnson had been acquitted on the trial for assault upon and robbery of Rigas had been repeatedly called to the attention of the trial court, and the jury should have been advised as to the effect of that acquittal by an appropriate instruction.

Assuming, for the purposes of argument, that the majority correctly holds that the Rigas robbery was so closely related to the Williams murder, in time and general plan, that evidence concerning the Rigas robbery might properly be introduced as showing a prearranged plan or scheme to commit a series of robberies, this reasoning cannot apply to appellant Johnson, who was acquitted upon that trial, also bearing always in mind that the Rigas robbery was subsequent to the robbery and murder of Williams.

The cross-examination of appellant Johnson was clearly improper, he having made, on his examination in chief, no reference whatever to the Rigas robbery.

While it is true that, on the trial of one charged with crime, if the defendant takes the stand in his own behalf, he is subject to cross-examination to the same extent as any other witness (*State v. Brooks,* 89 Wash. 427, 154 Pac. 795; *State v. Thornburg,* 161 Wash. 288, 296 Pac. 824), nevertheless, the cross-examination must bear upon and be related to the testimony of the witness on direct examination.

In the case of *State v. Crowder,* 119 Wash. 450, 205 Pac. 850, this court, after citing Art. I, § 9, of the constitution of Washington, and two sections of the code, said:

"As to the constitutional question, there is no doubt that, when the accused takes the witness stand in his own behalf and by his testimony in chief opens up a pertinent subject,

he thereby submits himself to proper cross-examination on such subject, and may not prevent or defeat cross-examination thereon by claiming the protection of the constitutional provision. [Citing cases.]"

In the case cited, it appeared that the defendant, who had been charged with statutory rape, took the stand as a witness in his own behalf and, on cross-examination, was compelled to testify "that he did have intercourse with the prosecuting witness on three or four occasions, one being the act upon which the state elected to rely."

The court, after citing several prior decisions, referred at length to the three well-defined rules governing the cross-examination of an accused:

". . . first, the English or orthodox rule, to the effect that the taking of the witness stand is a complete waiver as to all facts, including those which merely affect credibility; second, that the waiver extends only to matters relative to the issue, and does not permit cross-examination on collateral matters such as merely affect credibility; and third, the rule, usually founded on a statute, which subjects the accused to such cross-examination as may be given to other witnesses, or (leaving out the question of impeachment, not material here) permits of cross-examination based only upon subjects opened up by his examination in chief. This is generally referred to as the 'American rule,' and is thus defined in 28 R. C. L. § 194, p. 604: [Quotation from text cited.]"

The court continued, referring to the American rule:

"This rule has been so largely adopted and followed in this country that it seems unnecessary to cite further authorities, though it must be admitted that there are some seeming inconsistencies in its application. While this court has never passed squarely upon this question in a criminal case, yet in civil cases there remains no doubt, and from the language of the statutes quoted and the expressions contained in our cases hereinbefore cited, it cannot be doubted that we are bound to the doctrine of the modern, or American rule, and it only remains to apply it to the facts in this case."

The court held that the trial court had erred in permitting the cross-examination of the defendant, of which he com-

plained, and reversed the judgment of conviction, remanding the case for a new trial.

The following texts are pertinent to this inquiry:

20 Am. Jur. 299, Evidence, § 318: "Where the facts of the case bring it within one of the exceptions to the general rule that evidence of an independent crime is not admissible, the courts generally require that evidence of the accused's guilt of another crime shall not be admitted unless the proof of the other crime is clear and sufficient to authorize a finding of the defendant's guilt of such other crime; in other words, its commission must be shown beyond a reasonable doubt. In other cases it is said that there must be substantial evidence that the accused committed such other crimes. Other courts, however, deny that in order to render the testimony admissible such prior facts must be established by weight of evidence which will amount to demonstration and shut out all doubt or question of its existence."

4 Nichols Applied Evidence 3428, §§ 11, 12: "Where it is competent for the prosecution to prove other crimes similar to the one charged, the evidence as to the other similar crimes must at least make out a prima facie case that such other crimes were committed by defendant.

"When evidence of other crimes is admitted it should be carefully guarded by instructions so that its operation may be confined to the legitimate purposes for which it is competent."

1 Wharton's Criminal Evidence (11th ed.) 567, § 360: "Certain conditions must always exist as a predicate to the admission of evidence of other crimes. Such evidence, being a departure from the general rule of exclusion, is only admitted to render more certain the ascertainment of the exact truth as to the charge under trial. In any loose relaxation of the rule, the danger to the accused is that evidence may be adduced of offenses that he has not yet been called upon to defend, of which, if fairly tried, he might be able to acquit himself."

In the case at bar, the trial court erred in permitting the cross-examination of appellant Johnson in connection with the Rigas matter. While, in ruling upon this question, the trial court was evidently under a misapprehension concerning prior testimony, the effect upon appellant Johnson was, of course, the same. The last portions of the quotations from Nichols and Wharton, *supra,* are particularly pertinent here.

The trial court also erred in permitting portions of the rebuttal testimony of the state's witness, Dorothy Day, which was not rebuttal to any of Johnson's testimony upon his examination in chief, but merely referred to portions of his cross-examination, which were improperly received in evidence.

The jury was never advised that Johnson had been acquitted upon the trial of himself and others for the Rigas robbery, and, from the testimony introduced, the jury was, beyond question, strongly prejudiced against appellant Johnson because of the testimony concerning his participation in that affair.

In view of the errors above referred to, I am convinced that, in the case at bar, appellant Johnson did not have a fair trial.

I am also convinced that, because of the errors referred to above, appellant Brown was unduly prejudiced, and that the record discloses that he was denied the fair trial to which every person charged with crime is entitled.

The judgment appealed from should be reversed as to both appellants, and a new trial granted.

ROBINSON, J., concurs with BEALS, J.

ON REHEARING.

[*En Banc.* February 4, 1949.]

PER CURIAM.—Upon a rehearing *En Banc* on the 10th day of January, 1949, a majority of the court adheres to the opinion heretofore filed herein.

SIMPSON, J. (dissenting)—I concur in the dissents written by Judges Beals and Millard.

BEALS, J. (dissenting)—For the reasons stated in my dissent, I am not in accord with the opinion of the majority.